SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| STATE OF ARIZONA, | ) Arizona Supreme Court |
| | ) No. CR-06-0220-AP |
| Appellee, | ) |
| | ) Maricopa County |
| v. | ) Superior Court |
| | ) No. CR2001-092032 |
| SHAWN PATRICK LYNCH, | ) |
| | ) |
| Appellant. | ) |
| | ) **O P I N I O N** |
| _____ | ) |

Appeal from the Superior Court in Maricopa County
The Honorable David M. Talamante, Judge

**CONVICTIONS AFFIRMED; REMANDED IN PART**
_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                    Phoenix
      By    Kent E. Cattani, Chief Counsel,
            Criminal Appeals/Capital Litigation Section
            Deborah A. Bigbee, Assistant Attorney General
Attorneys for State of Arizona

DAVID GOLDBERG, ATTORNEY AT LAW                    Fort Collins, CO
      By    David Goldberg
Attorney for Shawn Patrick Lynch
_____

**H U R W I T Z**, Vice Chief Justice

¶1        Shawn Patrick Lynch was convicted of armed robbery, burglary, kidnapping, and first degree murder.  He was sentenced to death for the murder and to lengthy prison sentences for the other crimes.  An automatic notice of appeal was filed under Arizona Rules of Criminal Procedure 26.15 and 31.2.  This Court has jurisdiction under Article 6, Section 5(3) of the Arizona

Constitution and Arizona Revised Statutes ("A.R.S.") §§ 13-755, 13-4031, and 13-4033 (2010).[1]

## I. FACTS AND PROCEDURAL HISTORY[2]

¶2      James Panzarella lived in a guesthouse behind his parents' Scottsdale home.  On March 24, 2001, James left his car at his brother's home and took a cab to a Scottsdale bar.  He was seen at the bar with two men later identified as Mike Sehwani and Shawn Patrick Lynch.  James, Sehwani, and Lynch went to James's guesthouse early in the morning of March 25.

¶3      At around 5:00 a.m., an escort service received a call from Sehwani and dispatched an escort and bodyguard to the guesthouse.  The bodyguard collected a $175 fee from James.

¶4      The escort and Sehwani went into a bedroom, while James and Lynch talked with the bodyguard in the kitchen.  Sehwani wrote two checks from James's checkbook to the escort totaling $300.  The bodyguard and escort left around 6:00 a.m.

¶5      About 7:15 a.m. Lynch and Sehwani went to a supermarket, where Sehwani bought cigarettes with James's American Express card.  Ten minutes later, the card was reported as lost and invalidated.  Sehwani nonetheless shortly thereafter

---

[1]     This opinion cites the current version of statutes unless there has been a material change in the relevant law since the offenses.

[2]     We view the facts in the light most favorable to sustaining the guilty verdicts.  *State v. Garza*, 216 Ariz. 56, 61 n.1, 163 P.3d 1006, 1011 n.1 (2007).

used the card to buy gas at a convenience store. Lynch then entered the store to get matches. Later that morning, Sehwani, accompanied by Lynch, unsuccessfully attempted to use the card at a department store.

¶6 Around noon, Sehwani used James's Bank One credit card at a restaurant. This credit card was also used twice that day at a convenience store. That afternoon, Lynch and Sehwani checked into a motel. Lynch registered in his name and paid with cash; Sehwani presented James's credit card to rent movies. That evening, Lynch and Sehwani checked into another motel, again registering in Lynch's name and paying cash.

¶7 On the afternoon of March 25, James was found bound to a metal chair in the guesthouse kitchen. His throat was slit and blood was pooled on the tile floor.

¶8 The guesthouse was in disarray. In a bedroom, police found a large hunting knife. In the kitchen, they found a knife block with a missing knife. American Express receipts from the March 25 supermarket and convenience store purchases were also found in the guesthouse.

¶9 Early in the morning of March 26, James's Bank One debit card was used to withdraw cash from an ATM. A later attempted withdrawal was unsuccessful. The debit card was also used later that morning to buy clothing and Everlast shoes, and at least twice otherwise that same day.

¶10    Police arrested Lynch and Sehwani that afternoon as they entered a truck in the motel parking lot. Sehwani wore white Everlast sneakers and had James's credit cards and checks in his wallet. Matches from the convenience store and the keys to James's car were in the truck. A black sweater with James's blood on it was behind the seats. A .45 caliber pistol belonging to James was later found in the motel room. Blood on Lynch's shoes tested positive for James's DNA.[3]

¶11    Lynch and Sehwani were charged with first degree murder (both felony and premeditated), armed robbery, burglary, and kidnapping. Lynch was tried first. The jury found him guilty on all counts, but did not reach a unanimous verdict on premeditated murder.

¶12    In the aggravation phase of the trial, the jury could not agree on whether the murder was committed in expectation of pecuniary gain. See A.R.S. § 13-751(F)(5) (2010). The jury made separate findings that the murder was both especially heinous and cruel, but could not decide whether the murder was also especially depraved. See A.R.S. § 13-751(F)(6). In the penalty phase, the jury could not reach a unanimous verdict.

¶13    A second jury was impaneled. That jury found both the (F)(5) aggravator and the depravity prong of the (F)(6)

---

[3]    The murder weapon could not be positively identified. The handle of the hunting knife found in the guesthouse bedroom contained Sehwani's DNA, but there was no blood on the blade.

aggravator.  The second jury then unanimously determined that Lynch should be sentenced to death for the murder.[4]

## II. ISSUES ON APPEAL

### A.  GUILT PHASE

#### 1.  Competence to Stand Trial

¶14      Before trial, the court ordered a Rule 11 examination after Lynch refused to meet with his lawyers.  *See* Ariz. R. Crim. P. 11.  Based on that evaluation, the court found Lynch incompetent to stand trial and ordered restoration services. Five months later, after considering a psychologist's report that was stipulated into evidence, the court found Lynch restored to competency.

¶15      Six months later, defense counsel requested a second Rule 11 evaluation, alleging that Lynch suffered from delusions and therefore could not assist in his defense.  He offered no other support for this motion, which the court denied.

¶16      Lynch argues that the trial court erred in finding that he had been restored to competency and refusing to order a second Rule 11 examination.  We review these rulings for abuse of discretion.  *State v. Glassel*, 211 Ariz. 33, 44 ¶ 27, 116 P.3d 1193, 1204 (2005); *State v. Romero*, 130 Ariz. 142, 147, 634 P.2d 954, 959 (1981).

---

[4]    Sehwani later pleaded guilty to first degree murder and theft.  He received consecutive sentences of natural life and one year, respectively.

**¶17** The psychologist's report amply supports the trial court's finding that Lynch had been restored to competency. The psychologist concluded that Lynch understood the nature of the proceedings against him and could assist in his defense. Although acknowledging that Lynch suffered from various delusions and idiosyncratic thought processes, the psychologist noted that these "errant thoughts . . . do not appear to significantly affect his ability to deal with relevant issues pursuant to his alleged crime and pursuant to a possible trial." The expert concluded that Lynch "can cooperate with his attorney, should he choose to do so."

**¶18** Nor did the court err in refusing to order a second competency hearing. Lynch proffered no new information to call into question the court's previous finding of competency. The earlier expert report had noted Lynch's delusions but concluded that they did not render him incompetent to assist in his defense. In the absence of any new evidence, the court did not abuse its discretion in continuing to rely on that report. *See State v. Kuhs*, 223 Ariz. 376, 380 ¶ 16, 224 P.3d 192, 196 (2010).

### 2. Description of Capital Case Process to First Jury

**¶19** Lynch argues that during voir dire of the first jury, the trial court "gave no details regarding what an aggravating or mitigating circumstance might entail or how a juror would

6

factor such information into the penalty decision." He maintains that the State was thus able to pack the first jury with pro-death penalty jurors. No objection was raised below, so we review only for fundamental error. *Id*. at 386 ¶ 52, 224 P.3d at 202.

¶20    Because the first jury did not return a death sentence, Lynch was not prejudiced by the trial court's description of the capital sentencing process. But in any event, we find no error.

¶21    The superior court properly told the panel that "[n]ot every murder contains aggravating factors and only those that are found to have aggravating factors are eligible for consideration for the death penalty." *See* A.R.S. §§ 13-752(D) (2010), 13-751(E). The court also correctly defined a "mitigating circumstance" as "any factor relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities, record or circumstances of the offense." *See* A.R.S. § 13-751(G). The court accurately explained that each juror should consider any mitigating factors found by that juror in determining whether a death or life sentence was appropriate. *See* A.R.S. § 13-751(C).

### 3. Refusal to Conduct Sequestered Voir Dire

¶22    Lynch maintains that the trial court erred by denying sequestered voir dire of the first jury. We review for abuse of

7

discretion.  *State v. Bible*, 175 Ariz. 549, 570, 858 P.2d 1152, 1173 (1993).

**¶23**     Lynch does not claim that sequestered voir dire was necessary because of "unusually sensitive subjects" or extensive pretrial publicity.  *See id*. (noting that in camera voir dire is "most useful" in such cases).  Rather, Lynch argues that separate voir dire is required in *every* capital case.  We expressly rejected that proposition in *Bible*.  *Id*.

**¶24**     Lynch also fails to identify any "contaminating" statement by a prospective juror that "might color the entire jury's outlook."  Ariz. R. Crim. P. 18.5(d), cmt.; *see Bible,* 175 Ariz. at 570, 858 P.2d at 1173 (noting absence of such a statement in finding no error in group voir dire).  On this record, the trial court did not abuse its discretion in declining to order sequestered voir dire.

**4.  Striking Juror 119 for Cause**

**¶25**     Lynch argues the trial court erred by striking Juror 119 from the first jury for cause over his objection.  "Because a trial judge has the best opportunity to assess whether a juror can be fair and impartial, appellate courts review such decisions only for abuse of discretion."  *State v. Hickman,* 205 Ariz. 192, 201 ¶ 39, 68 P.3d 418, 427 (2003); *see also Uttecht v. Brown*, 551 U.S. 1, 22 (2007) (requiring appellate "deference

to the trial court, which is in a superior position to determine the demeanor and qualifications of a potential juror").

¶26 Jurors cannot be excluded "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968); *accord State v. Anderson* (*Anderson I*), 197 Ariz. 314, 324 ¶ 23, 4 P.3d 369, 379 (2000). A juror may properly be excused, however, if his views would "prevent or substantially impair the performance of his duties as a juror." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). "[J]urors who state unequivocally that they could never impose the death penalty regardless of the facts of the particular case" are properly excluded. *Anderson I*, 197 Ariz. at 318 ¶ 7, 4 P.3d at 373.

¶27 Juror 119 stated several times during voir dire that she was not certain she could sentence someone to death. During questioning by defense counsel, however, she stated, "[w]hen you were asking [another juror] the questions, I thought to myself if the circumstances – if I would hear that it were a particularly brutal or heinous murder, yes. I might be able to vote for the death penalty in that case."

¶28 Lynch contends that this statement demonstrated that Juror 119 could fairly consider the death penalty. However,

9

after making this statement, Juror 119 said that "[i]t would be very difficult to make that decision to take someone's life. It would be very, very difficult." The trial judge excused the juror only after considering the entirety of her answers and demeanor. Given Juror 119's statements and the deference we owe to the trial court, we cannot conclude that the judge abused his discretion.

### 5. Admission of Crime Scene Photographs

¶29 During the guilt phase, the trial court admitted six crime scene photographs over Lynch's objection. We review rulings admitting evidence in general, and photographs in particular, for abuse of discretion. *State v. McGill*, 213 Ariz. 147, 154 ¶ 30, 140 P.3d 930, 937 (2006).

¶30 "The admissibility of a potentially inflammatory photograph is determined by examining (1) the relevance of the photograph, (2) its tendency to incite or inflame the jury, and (3) the probative value versus potential to cause unfair prejudice." *State v. Cruz*, 218 Ariz. 149, 168-69 ¶ 125, 181 P.3d 196, 215-16 (2008) (internal quotation marks omitted). Although photographs may not be introduced solely to inflame the jury, *State v. Anderson* (*Anderson II*), 210 Ariz. 327, 340 ¶ 40, 111 P.3d 369, 382 (2005), "[t]here is nothing sanitary about murder," and we do not "require[] a trial judge to make it so,"

10

*State v. Rienhardt*, 190 Ariz. 579, 584, 951 P.2d 454, 459 (1997).

¶31    The photographs depict blood spatter and blood pools in relation to the victim's body and thus corroborate the opinion of the State's expert that the person who slit James's throat stood behind the chair.  Although the photographs are disturbing, none is overly gruesome.  The probative value of the photographs is not substantially outweighed by any prejudicial effect, *see* Ariz. R. Evid. 403, and the trial court did not abuse its discretion in admitting them.

**6.   Refusal to Give an Instruction on Second Degree Murder**

¶32    Lynch requested an instruction on second degree murder.  The trial court denied the request because it found no evidence that the murder was not premeditated.

¶33    A trial court must give an instruction on lesser-included offenses when warranted to reduce the risk that a jury, faced only with a choice between convicting for a capital crime and setting a violent criminal free, might be unduly pressured to opt for the conviction on the capital offense.  *Beck v. Alabama*, 447 U.S. 625, 637 (1980).  However, *Beck* "does not require a trial court to instruct on a lesser offense that is unsupported by the evidence."  *State v. Bearup*, 221 Ariz. 163, 170 ¶ 29, 211 P.3d 684, 691 (2009) (quoting *State v. Landrigan*, 176 Ariz. 1, 6, 859 P.2d 111, 116 (1993)).

11

¶34 In this case, the jury agreed only that Lynch committed felony murder; it did not reach a unanimous verdict on premeditated murder. Second degree murder is not a lesser included offense of felony murder. *State v. Jackson*, 186 Ariz. 20, 27, 918 P.2d 1038, 1045 (1996). Therefore, even if we assume that the record warranted such an instruction, Lynch suffered no prejudice from the trial court's refusal to give it.

**B. AGGRAVATION PHASE**

**1. Exclusion of Jurors 25 and 49 (Second Jury) For Cause**

¶35 During voir dire of the second jury, Juror 25 stated that she was Catholic and did not believe in the death penalty, but would "go against" those views in a case involving children. When informed that this was not such a case, she stated that she "could not do the death penalty because of my beliefs."

¶36 The court excluded Juror 25 for cause over Lynch's objection. Citing *State v. Johnson*, 212 Ariz. 425, 434-35 ¶¶ 29-35, 133 P.3d 735, 744-45 (2006), Lynch argues that the trial court erred in telling the juror about the specific facts of this case. Lynch did not raise this argument below, so fundamental error review applies. *Kuhs*, 223 Ariz. at 386 ¶ 52, 224 P.3d at 202.

¶37 Contrary to Lynch's argument, *Johnson* does not prohibit telling jurors about the particular facts of the case during voir dire. Rather, *Johnson* only held that the trial

12

court may refuse to permit parties to ask jurors to speculate on or commit to how they would assess specific mitigation. 212 Ariz. at 435 ¶ 33, 133 P.3d at 745; *see also State v. Smith*, 215 Ariz. 221, 231 ¶ 42, 159 P.3d 531, 541 (2007) ("[T]he same is true of voir dire focused on the assessment of specific aggravators.").

¶**38**     The trial judge's statement to Juror 25 that children were not involved in the case was appropriate to determine whether the juror's views would "prevent or substantially impair the performance of [her] duties." *Witt*, 469 U.S. at 424 (quoting *Adams*, 448 U.S. at 45). And, given Juror 25's responses, the judge reasonably concluded that her religious beliefs would substantially impair her ability to impose death.

¶**39**     We also find no error in excluding Juror 49. In her questionnaire, Juror 49 stated, "I am <u>ADAMANTLY</u> anti death penalty and absolutely could not sit on a jury that would possibly be responsible for killing anyone, even a guilty person." She said that she could not vote for death "under any circumstances," that she did not know whether she would be able to follow the law, and that she likened the death penalty to "murder."

### 2. Failure to Clarify Theory of First Degree Murder

¶**40**     Lynch requested that prospective jurors for the second aggravation phase be told that he had not been convicted of

13

premeditated murder, but only felony murder. The trial court instead initially informed the panel that Lynch had been convicted of "first degree murder." Citing *Morgan v. Illinois*, 504 U.S. 719 (1992), Lynch argues the court erred by not instructing the second jury that the first panel had unanimously found only felony murder.

¶**41**     *Morgan* held that a defendant must be allowed to ask prospective jurors if they would automatically vote for death after a guilty verdict. 504 U.S. at 729. Lynch was not prevented from so inquiring. Rather, he unsuccessfully urged the trial court to describe the theory underlying the murder conviction. In any event, the second jury was told after selection that Lynch had been convicted of felony murder. Thus, no sitting juror was under any misapprehension that Lynch had been convicted of premeditated murder.

### 3. Reckless Indifference Instruction

¶**42**     The first jury found that Lynch was a major participant in the crime and acted with reckless indifference to the grave risk of death. *See Tison v. Arizona*, 481 U.S. 137, 157-58 (1987) (requiring such findings for imposition of death sentence in felony murder cases). Lynch contends the trial court improperly instructed the jury as to what constitutes reckless indifference.

14

¶43        *Tison* defined reckless indifference as "knowingly engaging in criminal activities known to carry a grave risk of death." 481 U.S. at 157. The standard is subjective – whether the defendant "subjectively appreciated that [his] acts were likely to result in the taking of innocent life." *Id.* at 152.

¶44        Lynch requested the following "reckless indifference" instruction:

> In order to find that Shawn Lynch acted with reckless indifference to human life, it must be proven that he subjectively knew his acts were likely to result in the taking of innocent life, yet nonetheless engaged in criminal activities known to carry a high probability of death.

The court instead instructed the jury that "[a] defendant acts with reckless indifference when the defendant knowingly engages in criminal activities that he is aware will likely create a grave risk of death to others." Lynch acknowledges that the court's instruction correctly required subjective awareness, but argues that it was "not as clear" as his proposed instruction.

¶45        The trial court's reckless indifference instruction clearly and correctly stated the law. Nothing in the instruction even remotely suggests an objective or "reasonable person" standard.

**4. Sufficiency of the Evidence on the *Tison* Findings**

¶46        Lynch contends that the jury's *Tison* findings were not supported by the evidence. We determine "whether substantial

15

evidence supports the jury's finding, viewing the facts in the light most favorable to sustaining the jury verdict." *State v. Roque*, 213 Ariz. 193, 218 ¶ 93, 141 P.3d 368, 393 (2006).[5] Substantial evidence is "proof that reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt." *Id.* (internal quotations omitted).

¶47      Substantial evidence supported the jury's finding that Lynch was a major participant in the predicate felonies. The American Express receipts found at the guesthouse show that Lynch and Sehwani returned to the guesthouse after discovering that James had deactivated the American Express card. James's car keys, credit cards, checks, sweater, and pistol were found in the truck that Lynch was entering when arrested. *See State v. Lacy*, 187 Ariz. 340, 351, 929 P.2d 1288, 1299 (1996) (finding substantial participation in predicate burglary when defendant stole property).

¶48      Reasonable jurors could also conclude from the evidence that Lynch and Sehwani acted in concert to bind James to the chair and that Lynch was thus a major participant in the kidnapping. Lynch probably helped tie James to the chair

---

[5]     *Tison* findings are not aggravating circumstances and therefore not subject to independent review under A.R.S. § 13-755(A). *State v. Garcia*, 224 Ariz. 1, 20 ¶ 88 n.3, 226 P.3d 370, 389 n.3 (2010).

16

because Sehwani likely could not have done it alone. *See State v. Robinson*, 165 Ariz. 51, 62, 796 P.2d 853, 864 (1990) (finding that actions of defendant who "was at least present" when victims' hands and feet were bound and when the murder occurred met *Tison* standard).

¶49 Substantial evidence also supports the jury's finding that Lynch acted with reckless indifference toward James's life. *See State v. Ellison*, 213 Ariz. 116, 135 ¶ 73, 140 P.3d 899, 918 (2006) (finding reckless indifference when defendant bound victims and held pillow over one victim's face). A State expert opined that James's throat was slit by someone standing behind the chair and that the blood on Lynch's shoes was consistent with his having been in that position.[6]

### 5. "Retrial" of *Tison* Predicates

¶50 Lynch contends that the second jury improperly "retried" the *Tison* predicates. The trial court, however, never submitted any *Tison* issues to the second jury. That jury appropriately heard evidence about Lynch's participation in the crime, because it was entitled to consider the circumstances of the offense in evaluating mitigation. *See* A.R.S. § 13-751(G); *State v. Garza*, 216 Ariz. 56, 68 ¶ 57, 163 P.3d 1006, 1018 (2007).

---

[6] Another expert testified that Lynch's left shoe was a "highly probable" match for footwear impressions in the bathroom and living room of the guesthouse.

17

## 6. Admission of Autopsy Photos

¶51     During the first aggravation phase, the court admitted three autopsy photographs over Lynch's objections. During the second aggravation phase, the court admitted two of those photographs over Lynch's objections. We review for abuse of discretion. *McGill*, 213 Ariz. at 154 ¶ 30, 140 P.3d at 937.

¶52     The photographs are close-ups of the victim's neck wound. One depicts a cut jugular vein. Another shows a completely severed carotid artery. The third, admitted only in the first penalty phase, depicts the victim's torso covered in dried blood and his head tilted back, exposing a severed larynx.

¶53     The photographs were properly admitted to illustrate the testimony of the medical examiner. Moreover, before seeing the images, both juries heard expert testimony about the neck injuries without objection. *See State v. Pandeli*, 215 Ariz. 514, 529 ¶ 56, 161 P.3d 557, 572 (2007) (finding jurors were likely not shocked by photographs in light of medical examiner's prior testimony). Although these photographs were undoubtedly disturbing, the superior court did not abuse its discretion in admitting them. *See Anderson II*, 210 Ariz. at 340 ¶¶ 41-42, 111 P.3d at 382 (upholding admission of graphic photographs of murder victim).

18

### 7. Prosecutorial Misconduct

¶54 Lynch alleges a litany of prosecutorial misconduct, arguing that either the individual instances or the cumulative effect of the purported misconduct requires a retrial of the aggravation phases. "Because the trial court is in the best position to determine the effect of a prosecutor's comments on a jury, we will not disturb a trial court's denial of a mistrial for prosecutorial misconduct in the absence of a clear abuse of discretion." *State v. Newell*, 212 Ariz. 389, 402 ¶ 61, 132 P.3d 833, 846 (2006). "Reversal on the basis of prosecutorial misconduct requires that the conduct be so pronounced and persistent that it permeates the entire atmosphere of the trial." *State v. Hughes*, 193 Ariz. 72, 79 ¶ 26, 969 P.2d 1184, 1191 (1998) (citations and internal quotation marks omitted); *see also Anderson II*, 210 Ariz. at 340-41 ¶ 45, 111 P.3d at 382-83 (requiring a showing that the misconduct likely denied the defendant a fair trial).

### a. References to Lynch as the "Murderer"

¶55 In his opening statement in the second aggravation phase, the prosecutor said "the person sitting here in court has already been convicted of first degree murder. Shawn Patrick Lynch is a murderer." He further stated, "[James] was murdered, and the person who murdered him is sitting right here." Lynch moved for a mistrial.

19

¶56     The court denied the motion, noting that "Mr. Lynch has been convicted of first degree murder" and that referring to him "as a murderer is an accurate statement."  In any event, the court later informed the second jury that Lynch had been convicted of felony murder, thus negating any suggestion that the first jury had found Lynch to be the actual killer. Therefore, the trial court did not abuse its discretion in denying the mistrial motion.

### b. Testimony about Hunting Knife

¶57     In his second aggravation phase opening statement, the prosecutor said a witness would testify that the hunting knife found at the murder scene was "not consistent with that being the murder weapon."  Lynch moved for a mistrial, arguing that the expert in question would not rule out the knife as the murder weapon but rather would only testify that no DNA was detected on the blade.  The trial court denied the mistrial motion without prejudice to renewal if the expert testimony did not support the prosecutor's statement.  The court then instructed the jury that opening statements are not evidence.

¶58     Lynch did not renew his mistrial motion after the expert's testimony.  Even assuming that this omission did not waive any argument of misconduct, we find no impropriety in the prosecutor's statement.  The expert testified that because he could find neither blood nor DNA on the blade, he could not

20

conclude that it was the murder weapon. Although not conclusive, that testimony supported the prosecutor's assertion.

### c. Opening Statements

¶59 Lynch argues the prosecutor misstated the evidence in his opening statements in the guilt and second aggravation phases.

¶60 In the guilt phase, the prosecutor stated that Lynch and Sehwani "rode around in a truck that Mr. Sehwani – that the defendant drove." Because Lynch was entering the passenger side of a truck when he was arrested, he contends this statement was false. The identity of the truck's driver, however, was immaterial and, given that Lynch was riding in the truck, we can perceive no prejudice from any technical misstatement.

¶61 The prosecutor also asserted that Lynch and Sehwani "render[ed James] helpless" and that "there are some bruises as [James] attempted to get up." The evidence supported this statement. The medical examiner testified that James was tied to a chair and that a bruise on his shoulder may have been caused by "bang[ing] against the surface" of the chair.

¶62 The prosecutor later stated that "[t]here are keys, car keys to a Lexus. [James] owns a Lexus and they also took that." Although not a model of clarity, this statement can be construed as meaning that Lynch and Sehwani took the car keys, not the car. Moreover, given the trial testimony that James had

21

left his car at his brother's house on March 24 and never retrieved it, the jury could not have understood the statement to mean that Lynch and Sehwani stole the car.

¶63    Lynch argues that the prosecutor also suggested that Lynch arranged the escort service transaction by stating that "the financial terms are taking place at that table . . . and they take place between the [bodyguard]; James . . . and the individual, the defendant, that's just sitting there." This statement is reasonably understood, however, as meaning that the bodyguard and James participated in the negotiations, while Lynch was "just sitting there." This statement is supported by the testimony.

¶64    In the second aggravation phase, the prosecutor asserted that the bodyguard would testify that Lynch was "acting as if he owned the place . . . kind of like he was in charge" and that a knife was on the kitchen table. Lynch did not object. Moments later, the prosecutor stated that Lynch was "kind of being the boss of things." The evidence at least peripherally supported the prosecutor's statements. The bodyguard testified that a knife on the table, Lynch did most of the talking, and he offered the bodyguard a beer.

### d. Cumulative Misconduct

¶65    Lynch contends that even if each instance of alleged misconduct is individually harmless, reversal is warranted for

cumulative misconduct.  Reversal is required "if the cumulative effect of the incidents shows that the prosecutor intentionally engaged in improper conduct and did so with indifference, if not a specific intent, to prejudice the defendant."  *Roque*, 213 Ariz. at 228 ¶ 155, 141 P.3d at 403 (internal quotation marks and citations omitted).  However, "[a]bsent any finding of misconduct, there can be no cumulative effect of misconduct sufficient to permeate the entire atmosphere of the trial with unfairness."  *State v. Bocharski*, 218 Ariz. 476, 492 ¶ 75, 189 P.3d 403, 419 (2008).  Even assuming that one of the cited incidents technically involved a misstatement, we find no misconduct and nothing approaching pervasive unfairness in this case.

### 8.  (F)(5) Aggravator

#### a. Retrial of the (F)(5) Aggravator

¶66      Lynch argues that the trial court improperly permitted the second jury to reconsider the pecuniary gain aggravator.  We find neither statutory nor constitutional error.

¶67      The governing statutes, A.R.S. §§ 13-752(F) and (K), permit resubmission of the pecuniary gain aggravator to the second jury.  Section 13-752(F) mandates that the trial proceed directly to the penalty phase if the first jury finds at least one aggravating circumstance, even if that jury cannot reach a unanimous decision on another aggravator.  If the jury cannot

23

reach a unanimous decision in the penalty phase, the court must impanel a new jury. A.R.S. § 13-752(K). The second jury is only precluded from retrying "the defendant's guilt or the issue regarding any of the aggravating circumstances that the first jury found by *unanimous* verdict to be proved or not proved." *Id.* (emphasis added). The statute thus contemplates submission to the second jury of those aggravating circumstances that were not unanimously found by the original jury.

¶68 Contrary to Lynch's arguments, such a procedure did not subject him to double jeopardy. Failure to unanimously find an aggravator is not an acquittal for Fifth Amendment purposes, *Poland v. Arizona*, 476 U.S. 147, 155-56 (1986), nor does it collaterally estop a new trier of fact from considering the issue, *Yeager v. United States*, 129 S. Ct. 2360, 2368 (2009).

**b. Sufficiency of Evidence on the (F)(5) Aggravator**

¶69 Lynch contends that the evidence was insufficient to support the second jury's finding that "[t]he defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value." A.R.S. § 13-751(F)(5). Because the murder occurred before August 1, 2002, we independently review the jury's aggravation findings. A.R.S. § 13-755(A); *Anderson II*, 210 Ariz. at 354 ¶ 119 & n.21, 111 P.3d at 396 & n.21.

24

¶70       A felony murder conviction predicated on robbery or burglary does not automatically establish the (F)(5) aggravator. *Anderson II*, 210 Ariz. at 351 ¶ 103, 111 P.3d at 393.  Rather, the murder must itself be "prompted by the desire for pecuniary gain."  *Id.* at 351 ¶ 105, 111 P.3d at 393.

¶71       The evidence here establishes the (F)(5) aggravator beyond a reasonable doubt.  After the murder, James's gun and magazine clip were found in a motel room used by Lynch.  James's Bank One debit and credit cards were repeatedly used after the murder, among other things to secure charges at a motel room registered in Lynch's name.  Property belonging to James was found in the passenger compartment of the truck that Lynch was entering at the time of his arrest.

¶72       The evidence also strongly supports the conclusion that the killers returned to the guesthouse intending to steal further from James and that he was murdered to avoid detection of both the initial theft of the American Express card and the subsequent robbery and burglary.  *See Ellison,* 213 Ariz. at 143 ¶ 125, 140 P.3d at 926 (finding (F)(5) aggravator established when defendant planned a burglary and killed victims to escape and avoid identification).  The record does not suggest that pecuniary gain was an originally unintended consequence of the murder.  *See State v. Gillies,* 135 Ariz. 500, 512, 662 P.2d 1007, 1019 (1983) (finding (F)(5) aggravator not established

25

when defendant confessed that purpose of murdering rape victim was to eliminate her as a witness to her own rape, not to steal credit cards and cash).

¶73    Lynch argues that an (F)(5) finding is inappropriate because the evidence is not conclusive as to who controlled James's car keys and gun and because Sehwani used James's credit cards.   But a lack of subsequent control over robbery proceeds does not bar an (F)(5) finding; the aggravator requires only that the desire for pecuniary gain motivated the murder.   *State v. LaGrand*, 153 Ariz. 21, 36, 734 P.2d 563, 578 (1987). Similarly, we reject Lynch's argument that upholding the (F)(5) aggravator would require imputing Sehwani's motivations to Lynch.   The evidence sufficiently establishes that Lynch acted with his own pecuniary motivations.

### 9.  (F)(6) Aggravator

#### a. Absence of "Vicarious Liability" Instruction

¶74    Lynch contends the trial court erred in giving the following instruction in the first aggravation phase:

> Cruelty involves the infliction of physical pain and/or mental anguish on a victim before death.  A crime is committed in an especially cruel manner when a defendant either knew or should have known that the manner in which the crime is committed would cause the victim to experience physical pain and/or mental anguish before death.

Lynch argues that the instruction allowed the jury to impute cruelty to him solely because of Sehwani's actions.   Because

26

Lynch neither objected to this instruction nor requested an alternative, we review for fundamental error. *Kuhs*, 223 Ariz. at 386 ¶ 52, 224 P.3d at 202.

**¶75**     "There is no vicarious liability for cruelty in capital cases absent a plan intended or reasonably certain to cause suffering." *State v. Carlson*, 202 Ariz. 570, 583 ¶ 49, 48 P.3d 1180, 1193 (2002).  If the defendant neither committed the murder nor knew or should have known that the victim would suffer, the cruelty aggravator cannot be found on a "tort theory of culpability." *Id.*

**¶76**     *Carlson* involved a defendant who "was not present during commission of the crime, did not supply the murder weapon, and was not involved in planning the details or method of murder."   202 Ariz. at 583 ¶ 47, 48 P.3d at 1193.   In contrast, a reasonable inference from the evidence in this case is that Lynch, at a minimum, helped bind the victim before his throat was slit.  Given the evidence that Lynch's own actions caused the victim mental anguish, the instruction given was not fundamental error.

**b.   Sufficiency of Evidence on the (F)(6) Aggravator**

**¶77**     First degree murder is aggravated when conducted "in an especially heinous, cruel or depraved manner."  A.R.S. § 13-751(F)(6).  Although worded in the disjunctive, this subsection describes but one aggravating circumstance.  *State v. Djerf*, 191

27

Ariz. 583, 595 ¶ 44, 959 P.2d 1274, 1286 (1998). If the evidence supports one of the statutory grounds, we will uphold the (F)(6) finding. *See State v. Cromwell,* 211 Ariz. 181, 189 ¶ 43, 119 P.3d 448, 456 (2005) (declining to consider alleged errors related to heinousness or depravity because cruelty was established).

¶78 A murder is especially cruel when "the victim consciously experienced physical or mental pain prior to death, and the defendant knew or should have known that suffering would occur." *State v. Trostle*, 191 Ariz. 4, 18, 951 P.2d 869, 883 (1997) (internal citation omitted). That standard was met here. The evidence showed that James would have felt physical pain as his throat was cut. He would have continued to feel pain thereafter for at least a minute until he lost consciousness.

¶79 The evidence also establishes that James experienced mental anguish. He was almost surely conscious when bound to the chair, as "[t]here is no reason to bind an unconscious person who offers no resistance." *Djerf*, 191 Ariz. at 596 ¶ 49, 959 P.2d at 1287. Ligatures, abrasions, and bruising on James's wrists, hands, forearm, shoulder blade, back, and chest wall establish that he struggled. *See State v. Sansing*, 206 Ariz. 232, 236 ¶ 10, 77 P.3d 30, 34 (2003) (inferring mental anguish from victim's defensive wounds). Moreover, the number and complexity of the knots suggest that James had ample time to

28

suffer "significant uncertainty as to [his] ultimate fate." *State v. Van Adams*, 194 Ariz. 408, 421 ¶ 44, 984 P.2d 16, 29 (1999).

¶80      It was also "reasonably foreseeable" that James would suffer physical or mental pain. *Djerf*, 191 Ariz. at 595 ¶ 45, 959 P.2d at 1286. Lynch argues that physical pain was not foreseeable because the fatal wound was designed to lead to a quick death. But it is not obvious that cutting a throat will always lead to instantaneous death. In any event, it was surely foreseeable that James would suffer significant mental anguish while being bound to the chair.

¶81      The evidence supports the jury's finding that the murder was especially cruel. Because the (F)(6) aggravator was therefore established on that ground, we need not determine whether the evidence also supports the findings of heinousness or depravity. *Cromwell,* 211 Ariz. at 189 ¶ 43, 119 P.3d at 456.[7]

## C.  PENALTY PHASE

¶82      Lynch requested an instruction stating that the three separate jury findings of especial heinousness, cruelty, and depravity constituted only one aggravating circumstance. The

---

[7]    Similarly, we need not consider any allegations of error relating to the jury's findings of heinousness or depravity. Even if those findings were vacated, the (F)(6) aggravator would remain established.

29

court instead instructed the second penalty phase jury as follows:

> The following aggravating circumstances have been found to exist:
>
> 1. The defendant committed the murder in an especially cruel manner.
>
> 2. The defendant committed the murder in an especially heinous manner.
>
> 3. The defendant committed the murder in an especially depraved manner.
>
> 4. The defendant committed the murder in expectation of the receipt of anything of pecuniary value.

¶83    In his closing argument, the prosecutor cited this instruction and characterized the (F)(6) prongs as "three aggravating factors."  After the argument, Lynch unsuccessfully moved for a new trial.

¶84    Our decisions make plain that the (F)(6) aggravator is a single aggravating circumstance that can be established in alternative ways:  "Because this subsection is stated in the disjunctive, a finding of either cruelty or heinousness/depravity will suffice to establish this factor." *Djerf*, 191 Ariz. at 595 ¶ 44, 959 P.2d at 1286.  The court therefore erred in instructing the jury that three separate (F)(6) aggravating circumstances were proved.  *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996) (finding error in counting cruelty and heinousness as two separate factors).

30

¶85    The State argues that any error in the instruction was cured because the court also instructed the jury that "you shall not consider twice any fact or aspect of the murder."  But this general statement did not clarify that the especially heinous, cruel, and depraved findings constituted a single aggravating circumstance, because, as the jury here was instructed, each (F)(6) theory requires proof of different facts.  Especial cruelty requires proof that the victim was conscious, suffered physical pain or mental anguish, and the defendant knew or should have known the victim would suffer.  *Trostle*, 191 Ariz. at 18, 951 P.2d at 883.  In contrast, under the only theory proffered by the State that would support finding heinousness or depravity – gratuitous violence - proof is required that the defendant inflicted more violence than was necessary to kill and either knew or should have known that he had done so.  *Bocharski*, 218 Ariz. at 494 ¶¶ 85-87, 189 P.3d at 421.

¶86    Nor was the trial court's instructional error harmless.  An error is harmless only when the State proves beyond a reasonable doubt that the jury's decision "was surely unattributable to the error."  *State v. Valverde*, 220 Ariz. 582, 585 ¶ 11, 208 P.3d 233, 236 (2009) (quoting *State v. Anthony,* 218 Ariz. 439, 446 ¶ 39, 189 P.3d 366, 373 (2008)).  The State has not met that burden here.  The jury was told incorrectly that there were four aggravating factors rather than two, and

31

the prosecution emphasized this incorrect instruction in urging the death penalty. *See* A.R.S. §§ 13-751(E) (requiring penalty phase jury to "take into account the aggravating . . . circumstances that have been proven"); 13-751(F) (requiring jury to "consider . . . aggravating circumstances in determining whether to impose a sentence of death").

¶87    When an "error was made regarding a finding of aggravation" we are required to "independently determine if the mitigation . . . is sufficiently substantial to warrant leniency in light of the existing aggravation." A.R.S. § 13-755(B). When we conclude that the jury has erroneously found an aggravating circumstance, we use this extraordinary statutory power of independent reweighing to determine whether a death sentence nonetheless remains appropriate. *See, e.g.*, *State v. Tucker*, 215 Ariz. 298, 320-23 ¶¶ 96-120, 160 P.3d 177, 199-202 (2007); *State v. Carreon*, 210 Ariz. 54, 73 ¶¶ 96-98, 107 P.3d 900, 919 (2005).

¶88    The statute, however, only requires independent reweighing when "an error was made regarding a *finding* of aggravation." A.R.S. § 13-755(B) (emphasis added). This is not such a case. The jury here properly found both the (F)(5) and (F)(6) aggravators. The error in this case arises not from an improper aggravation finding, but rather from the trial court's faulty instruction in the penalty phase that the jury should

32

treat the case as involving four aggravators and the prosecutor's highlighting of that instruction during arguments exacerbated the error. Under these circumstances, § 13-755(B) does not authorize independent reweighing. Rather, we are constrained to remand for a new penalty phase trial before a properly instructed jury.[8]

### III. CONCLUSION

**¶89** For the reasons above, we affirm the convictions and non-capital sentences, but remand for a new penalty phase proceeding on the murder conviction. Any new penalty phase jury should be instructed that the (F)(5) and (F)(6) aggravators have been previously found and that it is not to retry those issues. *See* A.R.S. § 13-752(K).

_____
Andrew D. Hurwitz, Vice Chief Justice

CONCURRING:

_____
Rebecca White Berch, Chief Justice

_____
Michael D. Ryan, Justice

_____

[8] We therefore need not address Lynch's other arguments regarding imposition of the death penalty, including the twenty-seven arguments submitted to avoid preclusion in future federal proceedings.

_____
W. Scott Bales, Justice


_____
A. John Pelander, Justice