IN THE

_____

**STATE OF ARIZONA,**
*Appellee,*

*v.*

**WILLIAM CRAIG MILLER,**
*Appellant.*
_____

No. CR-11-0331-AP
Filed December 27, 2013
_____

Appeal from the Superior Court in Maricopa County
The Honorable Janet E. Barton, Judge
No. CR2006-112056-001
**AFFIRMED**
_____

COUNSEL:

Thomas C. Horne, Arizona Attorney General, Robert L. Ellman, Solicitor General, Jeffrey A. Zick, Chief Counsel, Capital Litigation Section, Jeffrey L. Sparks (argued), Assistant Attorney General, Phoenix, for State of Arizona

David Goldberg (argued), Ft. Collins, Co., for William Craig Miller

_____

CHIEF JUSTICE BERCH authored the opinion of the Court, in which VICE CHIEF JUSTICE BALES, JUSTICE PELANDER, JUSTICE BRUTINEL, and JUSTICE TIMMER joined.

_____

CHIEF JUSTICE BERCH, opinion of the Court:

¶1        William Craig Miller was convicted of five counts of first degree murder, among other charges, and was sentenced to death for each murder. This automatic appeal followed. We have jurisdiction under Article 6, Section 5(3) of the Arizona Constitution and A.R.S. § 13-4031.

## I. FACTUAL AND PROCEDURAL HISTORY[1]

¶2          In 2005, Miller's Scottsdale home burned down. Shortly thereafter, Miller's employee, Steven Duffy, admitted that he and Miller set the fire, and he and his girlfriend, Tammy Lovell, began cooperating with the police in the arson investigation. A few weeks later, Miller was indicted for arson and related fraud.

¶3          Miller blamed Steven for the indictment and told several people that he wanted to have Steven and Tammy killed. He tried to recruit four different men to kill them and their family. On February 21, 2006, three months after the arson, the police found the five victims — Steven, Tammy, Steven's brother Shane, and Tammy's children, Cassandra and Jacob — shot to death in their home.

¶4          Three guns were used in the murders. Witnesses linked two of the guns to Miller; the third apparently belonged to victim Steven Duffy.

¶5          Less than a week later, Miller staged a burglary at his rental home in an attempt to make it appear as if the victims' killer was after him too. While investigating the burglary, the police recovered several items, including bullets, that later linked Miller to the five murders.

¶6          Miller was indicted for the murders in 2006. After trial, a jury found him guilty of five counts of first degree murder, one count of first degree burglary, and four counts of solicitation of first degree murder. The jury also found four aggravating circumstances: prior conviction of a serious offense under A.R.S. § 13-751(F)(2); multiple homicides under § 13-751(F)(8); young age of the victim (Jacob, age 10) under § 13-751(F)(9); and witness elimination under § 13-751(F)(12). Concluding that the mitigation evidence was insufficient to warrant leniency, the jury returned death verdicts for each of the five murders. This automatic appeal followed.

## II. DISCUSSION

### A.          Speedy Trial

¶7          Miller argues that he was deprived of his Sixth Amendment

---

[1]          "We view the facts in the light most favorable to upholding the verdicts." *State v. Chappell*, 225 Ariz. 229, 233 ¶ 2 n.1, 236 P.3d 1176, 1180 n.1 (2010).

right to a speedy trial because of systemic breakdowns in the indigent defense system and the government's failure to adequately oversee his case. Because Miller did not assert this claim below, we review for fundamental error. *See State v. Schaaf*, 169 Ariz. 323, 327, 819 P.2d 909, 913 (1991).

¶8 "The Sixth Amendment's guarantee of a speedy trial protects a defendant's right to be brought to trial without undue delay." *State v. Parker*, 231 Ariz. 391, 398 ¶ 9, 296 P.3d 54, 61 (2013); *see also* U.S. Const. amend VI. To evaluate such claims, courts weigh "(1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of the right to a speedy trial, and (4) the prejudice to the defendant." *Parker*, 231 Ariz. at 398 ¶ 9, 296 P.3d at 61; *see also Barker v. Wingo*, 407 U.S. 514, 530-32 (1972). Although the length-of-delay factor carries the least weight, it triggers the full speedy trial or "*Barker*" analysis, requiring consideration of all four factors. *McCutcheon v. Superior Court (State)*, 150 Ariz. 312, 316, 723 P.2d 661, 665 (1986). Miller's trial began August 3, 2011, approximately five years and five months after Miller was indicted for the murders, a sufficient delay to require the full *Barker* analysis. *See State v. Spreitz*, 190 Ariz. 129, 140, 945 P.2d 1260, 1271 (1997) (finding a five-year delay presumptively prejudicial).

¶9 The second *Barker* factor requires assessment of who should bear the responsibility for the delay. *See Vermont v. Brillon*, 556 U.S. 81, 90 (2009). Any "delay caused by the defense weighs against the defendant." *Id.*

¶10 The first significant delay — approximately four-and-a-half months — was caused by Miller's vacillation on whether to represent himself and whether to plead guilty, as well as by the need for Rule 11 competency proceedings. Because nothing in the record indicates that Miller delayed the case unnecessarily, that delay does not weigh heavily against him. The longest portion of the pretrial delay — two years and nine months — resulted from defense counsel's failure to prepare the case. After granting several continuances, the court eventually removed Miller's lead counsel and appointed new counsel two-and-a-half months later. An additional eleven months were necessary to allow Miller's new lead counsel time to prepare for trial. Miller argues that these delays should be charged to the State because they resulted from systemic breakdowns in the indigent defense system. But the record does not show a systemic breakdown in this case; instead, defense counsel's personal issues, which were unknown to both the State and the trial court, caused most of the delay. "An assigned counsel's failure 'to move the case

forward' does not warrant attribution of [the] delay to the State. . . . A contrary conclusion could encourage appointed counsel to delay proceedings by seeking unreasonable continuances, hoping thereby to obtain a dismissal of the indictment on speedy-trial grounds." *Id.* at 92-93.

¶11     The third *Barker* factor is whether the defendant asserted the speedy-trial right. Miller's failure to assert the right does not weigh heavily against him because we "attach a different weight to a situation in which the defendant knowingly fails to object from a situation in which his attorney acquiesces in long delay without adequately informing his client." *Barker*, 407 U.S. at 529.

¶12     The fourth and most important *Barker* factor — prejudice to the defendant — does not support Miller's claim of a Sixth Amendment violation. *See State v. Soto*, 117 Ariz. 345, 348, 572 P.2d 1183, 1186 (1977) (calling prejudice the most important factor). To assess prejudice, we consider the interests the speedy trial right protects: (1) preventing "oppressive pretrial incarceration," (2) minimizing "anxiety and concern of the accused," and (3) limiting "the possibility that the defense will be impaired." *Barker*, 407 U.S. at 532. Miller alleges that prejudice resulted from oppressive pretrial incarceration. But, because he would have been incarcerated the entire time as a result of the arson charges, the delay in processing his murder case did not cause any prejudice resulting from incarceration. Moreover, during the trial process, Miller expressed a lack of concern about the delay, remarking that he was "going to get convicted" anyway. Finally, Miller does not argue that the pretrial delay impaired his defense.

¶13     Having weighed the four factors, we conclude that no Sixth Amendment violation occurred. *See Parker*, 231 Ariz. at 399 ¶¶ 17-18, 296 P.3d at 62 (finding no speedy trial violation when the defendant failed to show prejudice and the other *Barker* factors did not weigh in his favor). We therefore find no fundamental error.

### B.     Due Process Claim

¶14     Miller asserts that he was denied his Fourteenth Amendment right to due process when, after removal of his lead counsel, his new defense counsel was granted only eleven months to prepare for trial. The Fourteenth Amendment requires that appointed counsel have sufficient time to prepare a defense, *Powell v. Alabama*, 287 U.S. 45, 71 (1932), but does not "specif[y] any period which must intervene between the required appointment of counsel and trial," *Avery v. Alabama*, 308 U.S.

444, 446 (1940). Because Miller did not assert a due process violation in the trial court, we review for fundamental error. *See State v. Valverde*, 220 Ariz. 582, 585 ¶ 12, 208 P.3d 233, 236 (2009).

¶15 To prove the inadequacy of eleven months' preparation time, Miller points to one prospective defense attorney's estimate that he would have needed three years to properly prepare the case for trial. This fact alone does not establish a due process violation because Miller's new lawyer neither requested additional time nor asserted that he had not been given adequate time to prepare. Moreover, Miller's defense team included three attorneys, one of whom had been working on the case since its inception. Miller has thus failed to establish fundamental error.

## C. Consolidation of Murder and Solicitation Charges

¶16 Miller contends that the murder and solicitation charges were not properly joined under Arizona Rule of Criminal Procedure 13.3(a) and (c). That rule permits consolidation of offenses if they "[a]re alleged to have been a part of a common scheme or plan." Ariz. R. Crim. P. 13.3(a)(3). Consolidation is proper only if "the ends of justice will not be defeated thereby." Ariz. R. Crim. P. 13.3(c). We review a trial court's decision to consolidate charges for an abuse of discretion. *State v. Hausner*, 230 Ariz. 60, 74 ¶ 43, 280 P.3d 604, 618 (2012) (citation omitted).

¶17 On separate occasions, Miller asked four men to carry out the murders that he ultimately committed himself. The men he solicited each testified that Miller wanted the victims dead because Steven and Tammy had cooperated with the police. These facts are sufficient to establish a common scheme or plan among the solicitations and the murders. *Cf. id.* at 75 ¶ 47, 280 P.3d at 619 (finding a common plan based on a general thrill-seeking scheme when defendant randomly shot people and animals over a fourteen-month period). The two-month period between the solicitations and the murders does not diminish the relationship between the crimes because Miller's motive remained the same, and he continued to plan the murders throughout that period. That Miller had no precise plan for killing the victims, having suggested different methods of doing so to those solicited and then ultimately shooting the victims himself, did not preclude the trial court from finding that there was an overall plan to kill the victims. The key is that he had a "common scheme or plan" to solicit people to kill, not that he required each person solicited to follow a common plan.

5

¶18 When offenses are properly joined under Rule 13.3(a)(3), severance is required only if "necessary to promote a fair determination of the guilt or innocence of any defendant of any offense." Ariz. R. Crim. P. 13.4(a). To challenge the denial of a severance, a defendant "must demonstrate compelling prejudice against which the trial court was unable to protect." *State v. Prince* (*Prince I*), 204 Ariz. 156, 159 ¶ 13, 61 P.3d 450, 453 (2003) (internal quotation omitted). Miller alleges prejudice because the jury was improperly permitted to use Miller's solicitations to suggest that he committed the murders. But Miller cannot show "compelling" prejudice because the trial court instructed the jury to consider each count separately and explained that the State bore the burden to "prove each [element of each charged crime] beyond a reasonable doubt." *See Hausner*, 230 Ariz. at 75 ¶ 48, 280 P.3d at 619. The trial court did not abuse its discretion by consolidating the charges.

## D. Victims' Recorded Statements

¶19 Miller contends that the trial court erred in admitting in evidence three separate tape recordings of Tammy's and Steven's statements, which were played at trial. Miller objects to the recorded statements on the grounds that they included hearsay and violated his confrontation rights. He further argues that Tammy's statements contained inadmissible character evidence. Miller conceded in his opening brief and at oral argument that he failed to object on these grounds in the murder case. We therefore review for fundamental error. *State v. Henderson*, 210 Ariz. 561, 567 ¶ 19, 115 P.3d 601, 607 (2005).

### 1. Hearsay and confrontation

¶20 Miller's hearsay claim fails because Tammy's and Steven's statements were admissible under the forfeiture-by-wrongdoing exception to the hearsay rule, which permits admission of statements "offered against a party that has engaged . . . in wrongdoing that . . . procure[d] the unavailability of the declarant as a witness." Ariz. R. Evid. 804(b)(6) (2010) (amended 2012).[2] Miller argues that this exception permits hearsay only in the trial for which the defendant silenced the witness — here, the

---

[2] Rule 804 was amended in 2012 to conform to stylistic changes in the federal rules, without affecting its substance. *See* Ariz. R. Evid. 804 cmt. to 2012 amend.

arson case. But Rule 804(b)(6) contains no such limitation. Moreover, such a restriction would frustrate the rule's purpose of preventing a defendant from benefitting from his wrongdoing, *cf. Giles v. California*, 554 U.S. 353, 365 (2008) (explaining that common-law authorities applied this reasoning to justify the wrongful-procurement rule), which we recognize as sound public policy. Our reasoning comports with that of most other courts that have considered the issue. *See, e.g., United States v. Dhinsa*, 243 F.3d 635, 656-57 (2d Cir. 2001); *United States v. Emery*, 186 F.3d 921, 926 (8th Cir. 1999); *United States v. White*, 116 F.3d 903, 911-16 (D.C. Cir. 1997). Miller's confrontation objection was likewise extinguished by the forfeiture-by-wrongdoing exception. *Crawford v. Washington*, 541 U.S. 36, 62 (2004) (the forfeiture exception "extinguishes confrontation claims on essentially equitable grounds"). Thus, the trial court did not err, on either hearsay or confrontation grounds, in admitting the statements.

### 2. Other acts

**¶21** In one recording, Tammy made several highly prejudicial statements about Miller. For example, she told police that Miller "burnt his house down in Reno," that he had "buried two bodies in the desert," that he "pulverized people with baseball bats just because he doesn't like black people," and that his wife is "scared to death of him." Arizona Rule of Evidence 404(b) prohibits the use of evidence of other crimes, wrongs, or acts "to prove the character of a person in order to show action in conformity therewith." Such evidence is admissible only to prove "other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ariz. R. Evid. 404(b). Tammy's statements had no permissible purpose under Rule 404(b),[3] and it was never established whether Tammy had personal knowledge of the matters asserted. *See* Ariz. R. Evid. 602.

---

[3] In a quintuple homicide case supported by overwhelming evidence of guilt, we question the State's decision to seek admission of these inflammatory statements and the trial court's decision to allow them. The statements had minimal probative value and their admissibility was questionable. As we have stated before, prosecutors are not mere advocates, opposing the defense each step of the way, but should act as ministers of justice to ensure that defendants receive a fair trial. *State v. Roque*, 213 Ariz. 193, 228 ¶ 153, 141 P.3d 368, 403 (2006). Likewise, judges "are not referees at prize-fights but functionaries of justice." *State v. Bible*,

¶22        Nonetheless, we find no fundamental error because the statements were brief, the State did not emphasize the statements during closing argument, and Miller's convictions were supported by strong evidence of guilt.   Moreover, defense counsel did not object to the statements, characterizing his decision as a "strategic" choice.  Finally, the prejudicial impact of these statements was considerably lessened by the trial court's instruction to the jury to consider other acts only for their permissible purposes and not to use them "to determine the defendant's character."  We presume juries follow their instructions.  *See State v. Payne*, 23_ Ariz. ___, ___ ¶ 151, 314 P.3d ___, ___ (2013).  We therefore conclude that no fundamental error occurred.

### E.        Denial of Motion for Mistrial

¶23        Miller argues that the trial court erred in denying a motion for mistrial after a witness revealed that Miller had a prior felony conviction.  We review the denial of a mistrial motion for an abuse of discretion.  *State v. Roque*, 213 Ariz. 193, 224 ¶ 131, 141 P.3d 368, 399 (2006).

¶24        During the examination of witness Misty Cooper about her purchase of a gun for Miller, the State read a portion of a form she filled out at the gun store.  Cooper began speaking, though no question had been asked, and as part of a longer statement said that she "didn't know at the time that [Miller] was [a felon]."  At the close of direct, Miller requested a mistrial, which the trial court denied.  With the parties' agreement, the court then gave a curative instruction to the jury stating that "the only reason the defendant would have been prohibited from buying a gun in February of 2006 was because of the arson indictment."

¶25        A "declaration of a mistrial is the most dramatic remedy for trial error and should be granted only if the interests of justice will be thwarted otherwise."  *Id*.  To determine whether a mistrial is warranted, courts consider "(1) whether the jury has heard what it should not hear, and (2) the probability that what it heard influenced [it]."  *State v. Laird*, 186 Ariz. 203, 207, 920 P.2d 769, 773 (1996).  Although evidence of Miller's prior felony conviction was inadmissible for purposes of Rule 404(b), Ariz. R. Evid., we have held that "[w]hen a witness unexpectedly volunteers an inadmissible statement, the action called for rests largely within the

---

175 Ariz. 549, 595, 858 P.2d 1152, 1198 (1993) (quoting *Johnson v. United States*, 333 U.S. 46, 54 (1948)).  The court should exclude such evidence absent a clear record establishing the basis for its admission.

discretion of the trial court . . . [to] decide if some remedy short of mistrial will cure the error." *State v. Adamson*, 136 Ariz. 250, 262, 665 P.2d 972, 984 (1983).

**¶26** In this case, the witness's reference to a felony conviction was brief and fell in the middle of a lengthy statement. The trial court observed no reaction from the jurors. And nothing indicates that the prosecutor intentionally elicited the statement; he did not ask the witness a question and later told the trial court that he was unaware that Cooper knew about Miller's prior conviction. Given these facts, the trial court did not abuse its discretion in denying the motion for mistrial.

**¶27** Miller also argues that we should grant a new trial because the trial court's curative instruction misled the jury to believe that Cooper was referring to the arson indictment as the felony that prevented Miller from legally acquiring the gun. We agree that the instruction walked a fine line because it was not clear whether the witness was referring to Miller's arson indictment. But because the court's statement was technically accurate and Miller agreed that the instruction was appropriate, we review for fundamental error. *See Valverde*, 220 Ariz. at 585 ¶ 12, 208 P.3d at 236 (reviewing for fundamental error when no objection is made); *cf. State v. Logan*, 200 Ariz. 564, 565 ¶ 8, 30 P.3d 631, 632 (2001) (noting that a party who *requests* an erroneous instruction invites error). Although Miller did not request the instruction here, he did consent to it. We find no fundamental error.

### F. Firearms Expert

**¶28** At trial, a forensic firearms specialist testified about his examination of firearm toolmarks, which linked Miller to weapons used in the murders. He also testified that some of the bullets and bullet fragments had "unusual characteristics," likely made by a homemade silencer, which other evidence suggested Miller had made. Miller argues on appeal that it was fundamental error to admit such testimony because the court incorrectly applied the *Frye* test under Arizona Rule of Evidence 702 rather than the *Daubert* standard now applicable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588-95 (1993); *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923). Because Miller did not object below, we review for fundamental error. *See Valverde*, 220 Ariz. at 585 ¶ 12, 208 P.3d at 236.

**¶29** When Miller's case went to trial in August 2011, the *Frye* standard governed the admission of expert testimony. An amended Rule

702, which embraced the federal *Daubert* approach, was adopted in September 2011 and became effective on January 1, 2012. *See* Ariz. R. Evid. 702, cmt. to 2012 amend.; *State v. Benson*, 232 Ariz. 452, 459 ¶ 20 n.3, 307 P.3d 19, 26 n.3 (2013); Brian Pollock & Tore Mowatt-Larssen, *Arizona's Adoption of Federal Rule of Evidence 702*, 48 Ariz. Att'y 42, 43 (March 2012). Miller's trial ended in September 2011. Thus, the *Frye* standard governed the admissibility of expert testimony in this case.

**¶30** Citing *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987), in which the Supreme Court held that newly announced constitutional rules of criminal procedure must be applied retroactively to all criminal cases pending and not yet final, Miller asserts that the 2012 amendment to Rule 702 should have been applied in his case. As we explained in *Wood v. Goldfarb*, however, *Griffith* "is properly limited to new constitutional rules." 155 Ariz. 32, 33, 745 P.2d 90, 91 (1987). It does not mandate retroactive application of new non-constitutional rules. The 2012 amendment to Rule 702 is not a new constitutional rule, and we decline to retroactively apply it to this case.

**¶31** Miller contends that the firearms expert's testimony would not have been admissible under *Daubert*'s criteria, objecting both to the reliability of toolmark identification and to the sufficiency of the expert's qualifications. Because *Frye* applied at the time of Miller's trial, we need not consider the admissibility of the evidence under the *Daubert* standard contained in Rule 702, as amended in 2012. Under *Frye*, the expert's testimony was admissible. *See, e.g.*, *Fleming v. State*, 1 A.3d 572, 590-91 (Md. Ct. Spec. App. 2010). Because Miller neither objected to the testimony nor requested a *Frye* hearing, we find no error, fundamental or otherwise, in the admission of the firearms expert's testimony.

### G.     Solicitation Convictions

**¶32** Miller argues that the State presented insufficient evidence to support convictions on the four counts of solicitation of first degree murder. "A person . . . commits solicitation if, with the intent to promote or facilitate the commission of a felony . . . , such person commands, encourages, requests or solicits another person to engage in specific conduct which would constitute the felony." A.R.S. § 13-1002(A). The crime "requires no agreement or action by the person solicited, and . . . is complete when the solicitor, acting with the requisite intent, makes the command or request." *State v. Johnson*, 131 Ariz. 299, 302 n.1, 640 P.2d 861,

864 n.1 (1982) (quoting W. LaFave & A. Scott, Handbook on Criminal Law (1972)).

¶33        Miller's solicitation convictions stem from requests he made to four men — Jimmy McElroy, Jeffrey Drabe, Clayton Maxwell, and James Morris — to kill Steven, Tammy, and their family.  We review the sufficiency of the evidence de novo, *State v. West*, 226 Ariz. 559, 562 ¶ 15, 250 P.3d 1188, 1191 (2011), and consider "whether substantial evidence supports the jury's finding, viewing the facts in the light most favorable to sustaining the jury verdict," *Roque*, 213 Ariz. at 218 ¶ 93, 141 P.3d at 393.  Substantial evidence is "proof that reasonable persons could accept as adequate and sufficient to support a conclusion of [the] defendant's guilt beyond a reasonable doubt."  *Id.* (internal quotation omitted).  We consider the evidence as it relates to each solicitee.

1.        Jimmy McElroy

¶34        In December 2005, Miller bought Jimmy McElroy a plane ticket to Arizona.  McElroy testified that Miller picked him up at the airport, turned up the car radio to interfere with any listening devices, and asked him to kill Steven "because he turned state's evidence against him on the arson case."  Miller offered him $50,000 and, on another occasion, asked McElroy to "eliminate the whole family" for an additional $50,000.  Miller later said he did not have enough cash but would start a business for McElroy instead.  He paid McElroy approximately $2,500.

2.        Jeffrey Drabe

¶35        Soon after Miller asked McElroy to commit the murders, McElroy introduced Miller to Jeffrey Drabe.  Drabe testified that Miller asked him if he "knew somebody that [could] get rid of somebody," which Drabe understood to mean that Miller was looking for a hit man.  Later, while giving Drabe a ride home, Miller drove to Steven's house and indicated that he had attached a tracking device to Steven's car.

3.        James Morris

¶36        Miller also asked James Morris to kill Steven and his family, offering him $50,000 in cash, $100,000 in equipment, and an out-of-state business franchise as payment.

### 4. Clayton Maxwell

**¶37** Finally, Miller offered Clayton Maxwell, who also worked for Miller, $20,000 to kill Steven and $5,000 to kill each additional person in Steven and Tammy's home. Miller also asked Maxwell to conduct surveillance on Steven and to ascertain his daily routine. He also suggested how to perform the murders, proposing, for example, that he ride a bicycle up to Steven's car and "shoot him in the face," that he perform the murders at night, that he use a revolver to avoid leaving shell casings, and that he wear plastic gloves and long sleeves to avoid gunshot residue. He also suggested that Maxwell hide the murders by putting the victims' hands and heads in buckets of cement and dumping them in a body of water.

**¶38** Sufficient evidence supported each of Miller's solicitation convictions. Miller made direct requests to McElroy, Morris, and Maxwell to kill the victims, offered three of the men payment for the murders, and actually paid McElroy $2,500. Further demonstrating his seriousness, Miller paid for McElroy's plane ticket and was conscious of the need to interfere with listening devices. He employed Maxwell to conduct surveillance and made explicit suggestions about how to commit the murders. Finally, he drove Drabe to Steven's house and indicated that a GPS unit was attached to Steven's car.

**¶39** Miller contends that none of the men solicited believed Miller was serious. But solicitation only requires action and intent by the solicitor. It does not require that the solicited persons believe the solicitor is serious. *See Johnson*, 131 Ariz. at 302 n.1, 640 P.2d at 864 n.1. That Miller later committed the murders provides persuasive evidence that he had the specific intent "to promote or facilitate" the murders, as required by A.R.S. § 13-1002(A). In sum, substantial evidence supported the jury's determination that Miller solicited four people to commit the murders.

## H. Accomplice Mitigator

**¶40** During the guilt phase of the trial, the State presented evidence suggesting that Miller might have had an accomplice. The State requested and the court gave a jury instruction on accomplice liability. During the penalty phase, Miller requested that the jury be instructed: "If you find that other individuals participated in these murders and have never been prosecuted, you may consider that as a mitigating factor." The trial court refused, relying on *State v. Gallegos*, which explained that

although disparate sentences can be a mitigating circumstance, this factor "has no application when insufficient evidence exists to charge the other party with the alleged crime." 178 Ariz. 1, 20, 870 P.2d 1097, 1116 (1994).

¶41 Miller asserts that the trial court's refusal was error. "We review a trial court's refusal to give a jury instruction for abuse of discretion," but we assess the legal adequacy of the instructions de novo, viewing them in their entirety. *State v. Garcia*, 224 Ariz. 1, 18 ¶ 75, 226 P.3d 370, 387 (2010).

¶42 Although some evidence suggested that Miller might have had an accomplice, no evidence revealed the identity of the alleged accomplice or that any such person received a disparate sentence. Thus, we are not dealing with an identified, yet uncharged, accomplice, as was the case in *Gallegos*. To the extent that *Gallegos* informs the issue, it suggests that if the instruction was not required when an accomplice was known but not charged, it certainly was not required here, when even the existence of the alleged accomplice could not be confirmed.

¶43 Furthermore, no instruction was mandated by A.R.S. § 13-751(G)(3), which requires the trier of fact to consider the presence of an accomplice mitigating only when the defendant's participation in the crime is "relatively minor." No evidence suggested that Miller's participation was minor, and inasmuch as the jury unanimously convicted him of premeditated murder, it necessarily found that Miller was a major participant.[4] *See Payne*, 23_ Ariz. at ___ ¶ 147, 314 P.3d at ___.

¶44 Finally, citing *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), and *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986), Miller argues that the trial court's refusal to give the instruction violated his Eighth and Fourteenth Amendment rights by precluding the jury from considering relevant mitigation. Although sufficient evidence would have supported an instruction that the jury could consider acts of other participants, had the trial court chosen to give such an instruction, nothing required the trial court to do so. The general instructions that the trial court gave — to consider any relevant factor in mitigation — adequately stated the law

---

[4] Miller contends that had the trial court given an *Enmund/Tison* instruction, it would have been able to determine whether the jury found that he was a major participant in the crime. But when the judge asked Miller during the aggravation phase of the trial whether he should give an *Enmund/Tison* instruction, Miller agreed that no such instruction was necessary. He thus forfeited the argument absent fundamental error, which he does not assert.

and provided guidance to the jurors. It was within the trial court's discretion to determine that the specific instruction requested was inaccurate because it suggested that a known accomplice existed and was not prosecuted, or to reject it because its substance was adequately covered by other instructions. *Cf.* A.R.S. § 13-751(G) (permitting the jury to consider "relevant" mitigation); *State v. Ovante*, 231 Ariz. 180, 188 ¶ 35, 291 P.3d 974, 982 (2013) (stating that "[a] court is not required to give a separate instruction if its substance has already been covered by other instructions"). Moreover, nothing prevented Miller from referring to the alleged accomplice in closing argument. For these reasons, the trial court did not abuse its discretion in refusing Miller's requested instruction.

## I.    Jury Instructions and Verdict Form for (F)(8) Aggravating Circumstance

¶45      Miller argues that the verdict form and the jury instructions on the multiple homicides aggravator, A.R.S. § 13-751(F)(8), violated his right to a unanimous verdict. Because Miller did not object below, we review for fundamental error. *See State v. Dann* (*Dann III*), 220 Ariz. 351, 367 ¶ 76, 207 P.3d 604, 620 (2009).

¶46      It is an aggravating circumstance that a "defendant has been convicted of one or more other homicides . . . that were committed during the commission of the offense [for which he is being sentenced]." A.R.S. § 13-751(F)(8). Aggravators are like elements of a crime, which the state must prove beyond a reasonable doubt. A.R.S. § 13-751(B); *see also Dann III*, 220 Ariz. at 365 ¶ 65, 207 P.3d at 618. It follows that when a defendant has been convicted of multiple murders, the aggravator must be proven as to each conviction. Thus, in this case, the jury was required to find that for each of the five murders for which Miller was convicted, another murder was committed during that offense.

¶47      The verdict form given to the jury provided only one space for the jury to find the (F)(8) aggravator either proven or not proven, instead of five spaces to allow jurors to assess the aggravator in relation to each first degree murder count. This format provided no record that the jury unanimously found multiple murders as to each count. But Miller has the burden of proving that the jury failed to find the aggravating factor proven as to each count. *See Henderson*, 210 Ariz. at 567 ¶¶ 19-20, 115 P.3d at 607 (stating that the defendant must establish that error exists and that the error resulted in prejudice).

¶48          In this case, the jurors were instructed that, to find the (F)(8) aggravating circumstance, they had to find that the murders were temporally, spatially, and motivationally related, and having been so instructed, they returned a verdict finding the (F)(8) circumstance proved. Because all five victims were killed at the same time, in the same place, and for the same reason, no reasonable juror could have failed to find the (F)(8) aggravator proven as to each of the five murders. Thus, Miller has not established that fundamental error occurred.

## III.  ABUSE OF DISCRETION REVIEW

¶49          Because the murders in this case occurred after August 1, 2002, we review the jury's findings of aggravating circumstances and the imposition of the death sentences for an abuse of discretion. A.R.S. § 13-756(A). We will not find "an abuse of discretion if 'there is any reasonable evidence in the record to sustain [the findings and sentences].'" *State v. Delahanty*, 226 Ariz. 502, 508 ¶36, 250 P.3d 1131, 1137 (2011) (quoting *State v. Morris*, 215 Ariz. 324, 341 ¶ 77, 160 P.3d 203, 220 (2007)). Miller argues that the Fourteenth Amendment requires us to review his case de novo. We have rejected this argument before, *see, e.g.*, *State v. Cota*, 229 Ariz. 136, 153 ¶ 92, 272 P.3d 1027, 1044 (2012), and Miller presents no new reasons that cause us to reconsider it.

### A.      Aggravating Circumstances

¶50          The jury found four aggravating circumstances: prior conviction of a serious offense, multiple homicides, age of the victim (as to Tammy's son, Jacob, who was ten), and witness elimination (as to victims Tammy and Steven). A.R.S. § 13-751(F)(2), (8), (9), (12). On appeal, Miller argues that substantial evidence did not support the jury's findings that the (F)(8) (multiple homicides) and (F)(12) (witness elimination) aggravating factors were proven beyond a reasonable doubt. He does not contest the jury's findings regarding the (F)(2) and (F)(9) aggravating circumstances.

¶51          Under abuse of discretion review, we "determine whether substantial evidence supports the jury's finding, viewing the facts in the light most favorable to sustaining the jury verdict." *State v. Gallardo*, 225 Ariz. 560, 565 ¶ 15, 242 P.3d 159, 164 (2010). "Substantial evidence is such proof that reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt." *Id.*

1.      (F)(8) aggravator

**¶52**      To prove the (F)(8) aggravator, the state must show that more than one homicide occurred "during the commission of the offense," A.R.S. § 13-751(F)(8), which we have interpreted to mean that the murders must be "temporally, spatially, and motivationally related, taking place during one continuous course of criminal conduct." *Dann III*, 220 Ariz. at 364 ¶ 57, 207 P.3d at 617.

**¶53**      The murders were temporally and spatially related:   The victims were all killed in their home on one night.  The murders were also motivationally related.  The evidence showed that all five victims were killed because Miller wished to silence Steven and Tammy and prevent their cooperation with the police in the arson investigation.  *See supra* ¶¶ 33-38 (detailing evidence that Miller solicited four men to kill the victims because Steven cooperated with the police).  We have repeatedly found the motivational relationship requirement satisfied when evidence suggested that a defendant killed others in the vicinity to eliminate witnesses.  *See, e.g.*, *State v. Armstrong* (*Armstrong III*), 218 Ariz. 451, 464-65 ¶¶ 68-71, 189 P.3d 378, 391-92 (2008) (finding a motivational relationship when the defendant killed a second person to avoid getting caught for killing the first).

**¶54**      Miller argues that some evidence suggested that at least one of the murders might have been motivated by "imperfect self defense." But the five murders were motivationally *related*, whether or not the killings occurred as planned, because Miller went to the home for the purpose of killing the family.  *See State v. Dann* (*Dann II*), 206 Ariz. 371, 374 ¶ 10, 79 P.3d 58, 61 (2003) (holding murders motivationally related when defendant went to an apartment intending to kill one victim and killed two others "simply because they were there"); *see also Armstrong III*, 218 Ariz. at 464 ¶ 68, 189 P.3d at 391 (noting that "[t]he motives for killing each victim need not be identical").  Thus, the jury did not abuse its discretion in finding that the five murders were temporally, spatially, and motivationally related.

2.      (F)(12) aggravator

**¶55**      It is an aggravating circumstance if "[t]he defendant committed the offense [1] to prevent a person's cooperation with an official law enforcement investigation, [2] to prevent a person's testimony in a court proceeding, [3] in retaliation for a person's cooperation with an

official law enforcement investigation or [4] in retaliation for a person's testimony in a court proceeding." A.R.S. § 13-751(F)(12). The jury found this "witness elimination" factor proven as to the murders of Steven and Tammy.

¶56 Miller argues that the jury abused its discretion in finding that the State proved this aggravating circumstance beyond a reasonable doubt. At trial, the evidence revealed that Miller made several statements that he wanted to kill Steven and Tammy because of their cooperation with the arson investigation. He began planning and taking steps to carry out the murders shortly after he was indicted for the arson. Miller's statements and the timing of his plans provided sufficient evidence to support the jury's finding that Miller killed Steven and Tammy to prevent them from cooperating with the police or testifying against him, or to retaliate for their cooperation with the police.

### 3. Double counting

¶57 Miller next argues that the jury impermissibly double counted the fact that he killed Steven and Tammy because of their cooperation with the police by using that fact to establish both the (F)(12) aggravator and the motivational relationship requirement of the (F)(8) aggravator. "A jury may use one fact to find multiple aggravators, but it may not weigh the same fact twice when assessing aggravation and mitigation." *State v. Villalobos*, 225 Ariz. 74, 81 ¶ 28, 235 P.3d 227, 234 (2010).

¶58 The jury did not double count because the (F)(8) and (F)(12) aggravating circumstances focus on and are established by different acts. The fact that multiple murders occurred "during the commission of the offense" establishes the (F)(8) multiple homicides aggravator. A.R.S. § 13-751(F)(8). The motivations for the murders must be related, but what they are — jealousy, revenge, witness elimination, or otherwise — is not important. The crux of the aggravator is that multiple murders occurred.

¶59 In contrast, the (F)(12) aggravator may be found when murders are committed to eliminate witnesses. Only this one motivation suffices to establish the (F)(12) aggravating circumstance. Whether the defendant committed more than one murder — the essence of the (F)(8) aggravator — is irrelevant to the (F)(12) aggravator, just as the "intent to eliminate" motivation, needed to establish (F)(12), is not necessarily relevant to proving (F)(8). Thus, the record does not reflect that the jury

impermissibly weighed the same fact twice in assessing the aggravating circumstances for Tammy and Steven's murders.

¶60 In reviewing double-counting claims, we have often looked to whether the trial judge instructed the jury not to weigh the same fact twice in assessing aggravation. *See, e.g.*, *Chappell*, 225 Ariz. at 241 ¶¶ 48-50, 236 P.3d at 1188 (finding no error when the jury was properly instructed); *Villalobos*, 225 Ariz. at 81 ¶ 29, 235 P.3d at 234 (finding no error in jury's finding that (F)(6) and (F)(9) were proven despite prosecutor's comments on age, when "jury was expressly instructed not to consider age in determining whether the [(F)(6) aggravator was proven]"). Although this jury did not receive such an instruction, Miller neither requested one nor objected to its absence, and we therefore review for fundamental error and prejudice. *See Henderson*, 210 Ariz. at 567 ¶¶ 19-20, 115 P.3d at 607. Miller has not shown either double counting or prejudice.

¶61 Finally, citing *State v. Lynch*, 225 Ariz. 27, 42-43 ¶¶ 82-88, 234 P.3d 595, 610-11 (2010), Miller argues that the trial court committed fundamental and structural error by failing to sua sponte instruct the penalty phase jury not to double count Miller's motivation. *Lynch*, however, differs substantially from this case. There, the trial court incorrectly instructed the jury that the (F)(6) cruel, heinous, and depraved aggravating circumstance, which may be established in any of the three listed ways, was actually three separate aggravating circumstances, and the prosecutor cited the instruction and argued in closing that the state had proved a total of four aggravating circumstances rather than two. *Id.* at 42 ¶¶ 82-84, 234 P.3d at 610. This Court found that the objected-to error was not harmless. *Id.* at ¶ 86, 234 P.3d at 610.

¶62 *Lynch* does not suggest that failure to give an unrequested instruction on double counting always constitutes fundamental error. And because we have concluded that the jury did not improperly find any aggravating factor, *Lynch* is inapposite. We thus conclude that no fundamental error occurred.[5]

---

[5] The jury found the (F)(12) aggravating circumstance only with respect to the murders of Steven and Tammy. It did not find this factor regarding the deaths of Shane, Cassandra, and Jacob. Nonetheless, the jury returned death sentences for the murders of those three victims, suggesting that the presence or absence of the (F)(12) finding as to Steven and Tammy likely would not have affected the death sentence imposed as to each.

### B.     Death Sentence

¶63       "[W]e will not reverse [a] jury's decision [to impose the death penalty] so long as any reasonable jury could have concluded that the mitigation established by the defendant was not sufficiently substantial to call for leniency." *Morris*, 215 Ariz. at 341 ¶ 81, 160 P.3d at 220.  Miller presented a good deal of mitigation, including evidence that he suffered from Bipolar Disorder I; exhibited troubling behaviors as a child; had a family history of emotional difficulties, drug abuse, and alcohol problems; and had experienced difficulty controlling his impulses throughout his life.  Even if we accept all of Miller's mitigation evidence as true, we cannot conclude that the jury abused its discretion in finding that this evidence did not warrant leniency.

## IV.  CONCLUSION

¶64       For the foregoing reasons, we affirm Miller's convictions and sentences.[6]

---

[6]      Miller listed fourteen claims that this Court has previously rejected in order to preserve them for future review, should that occur.  We decline to revisit these claims.