IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**THE STATE OF ARIZONA,**
*Appellee,*

*v.*

**ISRAEL JOSEPH NARANJO,**
*Appellant.*

---

No. CR-11-0151-AP
Filed March 18, 2014

---

Appeal from the Superior Court in Maricopa County
The Honorable Roland J. Steinle, Judge
No. CR2007-119504-001

---

**AFFIRMED**

---

COUNSEL:

Thomas C. Horne, Arizona Attorney General, Robert L. Ellman, Solicitor General, Jeffrey A. Zick, Chief Counsel, Capital Litigation Section, Laura P. Chiasson (argued), Assistant Attorney General, Tucson, for State of Arizona

James J. Haas, Maricopa County Public Defender, Peg Green (argued), Deputy Public Defender, Terry J. Reid, Deputy Public Defender, Phoenix, for Israel Joseph Naranjo

---

JUSTICE PELANDER authored the opinion of the Court, in which CHIEF JUSTICE BERCH, VICE CHIEF JUSTICE BALES, JUSTICE BRUTINEL, and JUSTICE TIMMER joined

---

JUSTICE PELANDER, opinion of the Court:

¶1        A jury found Israel Joseph Naranjo guilty of two counts of first degree murder and sentenced him to death. We have jurisdiction

over this automatic appeal under Article 6, Section 5(3) of the Arizona Constitution and A.R.S. § 13-4031.

## I. BACKGROUND

**¶2** On March 25, 2007, Naranjo stabbed his pregnant girlfriend, Delia Rivera, twelve times, killing her and the unborn baby. After his arrest, Naranjo confessed to the murder.

**¶3** The State charged Naranjo with two counts of first degree murder. Rejecting Naranjo's insanity defense, the jury found him guilty of both counts. With regard to Rivera's murder, the jury found two aggravating factors: Naranjo was previously convicted of a serious offense, and the murder was especially cruel. With regard to the murder of Rivera's child, the jury likewise found two aggravating factors: Naranjo was previously convicted of a serious offense, and Naranjo was an adult when he killed an unborn child. In the penalty phase of the trial, after finding his mitigation not sufficiently substantial to call for leniency, the jury sentenced Naranjo to death for each murder.

## II. ISSUES ON APPEAL

### A. Waiver of *Miranda* Rights

**¶4** Naranjo argues the trial court erred in denying his motion to suppress his post-arrest confession. We review that ruling for abuse of discretion, viewing the evidence presented at the suppression hearing in the light most favorable to sustaining the ruling. *State v. Spears*, 184 Ariz. 277, 284, 908 P.2d 1062, 1069 (1996); *State v. Apelt*, 176 Ariz. 349, 363, 861 P.2d 634, 648 (1993).

**¶5** Following Naranjo's arrest on the day of the murders, Detective Alex Femenia interviewed him. At the beginning of the video-recorded interview, the detective advised Naranjo of his *Miranda* rights and asked if he understood those rights. After several requests, Naranjo twice replied, "yeah." Naranjo then confessed to the murders, stating, "I just remember just [sic] stabbing [Rivera]. I had to." Naranjo expressed remorse for his actions, stating, "I wish I could take [them] back." Naranjo also made several remarks questioning whether his situation was "real."

**¶6** Before trial, Naranjo moved to suppress incriminating statements he made during the interview, claiming he did not knowingly and intelligently waive his *Miranda* rights and that his statements were involuntary.[1] During a two-day evidentiary hearing on the motion, Naranjo called a clinical psychologist, Dr. Thomas Thompson, who testified that Naranjo was "actively psychotic" at the time of the interview. In response, the State called Detective Femenia, who testified that Naranjo did not act "strangely" before the interview and that Naranjo had fourteen police encounters before his arrest in this case. The trial court denied Naranjo's motion, ruling that his interview statements were voluntarily made after he validly waived his *Miranda* rights.

**¶7** A knowing and intelligent waiver of *Miranda* rights occurs when the suspect understands those rights and intends to waive them. *State v. Carrillo*, 156 Ariz. 125, 135 n.15, 750 P.2d 883, 893 n.15 (1988). In assessing a waiver, courts examine the totality of the surrounding circumstances, "including the defendant's background, experience, and conduct." *State v. Montes*, 136 Ariz. 491, 495, 667 P.2d 191, 195 (1983). The defendant's prior interactions with law enforcement are relevant to this inquiry. *Id.*

**¶8** Mental illness, by itself, will not invalidate an otherwise knowing and intelligent waiver. *See State v. Clabourne*, 142 Ariz. 335, 342, 690 P.2d 54, 61 (1984); *accord United States v. Turner*, 157 F.3d 553, 556 (8th Cir. 1998) (holding that, although defendant was intoxicated at the time of his confession and exhibited signs of mental illness, the defendant "understood his rights and knowingly waived them"). The test is whether a suspect's mental disabilities "render him unable to understand the meaning of his statements." *Clabourne*, 142 Ariz. at 342, 690 P.2d at 61.

**¶9** According to Naranjo, the record is "replete with objective factors" demonstrating that he was incapable of understanding his rights. He points to statements that he claims show his "irrational beliefs of a plot to kill him and his belief he needed to protect himself." He also notes that a jail mental health counselor reported that, during a post-arrest assessment, Naranjo looked up to the ceiling and said, "see all the dead

---

[1] Naranjo abandoned the latter argument on appeal.

people up there."  Viewed in the context of his documented history of mental illness, Naranjo argues that these statements and behavior show that his mental state "prevented him from making a knowing and intelligent waiver."

¶10        Other evidence in the record, however, supports the State's contention that during the interview Naranjo appreciated why he was there, what he had done, and the rights he was waiving.  When asked at the start of the interview if he understood his rights, Naranjo answered "yeah" and repeated that answer at Detective Femenia's request. Although Naranjo asserts that Femenia's recitation of his *Miranda* rights was "perfunctory" and structured to encourage a waiver, Naranjo does not argue that the warnings were deficient or otherwise invalid.  During the interview, Naranjo appears upset, somewhat distant, and at times unintelligible.  But he is generally coherent and responsive throughout the interview, recounting in some detail the circumstances surrounding the crime and expressing remorse for his actions.

¶11        On this record, the trial court could reasonably conclude that Naranjo understood the rights he waived and "appeared to be coherent and aware of the import of his statements."  *Clabourne*, 142 Ariz. at 342, 690 P.2d at 61 (holding, based on his tape recorded confession, that the defendant validly waived his *Miranda* rights despite his claim that he had taken heavy doses of the prescription drug Thorazine and exhibited "bizarre behavior indicative of mental illness").  The fact that Naranjo had fourteen prior encounters with the police also supports this finding.  The trial court did not abuse its discretion in finding that Naranjo knowingly, intelligently, and voluntarily waived his *Miranda* rights and ruling that the confession was admissible.

**B. Striking of Juror for Cause**

¶12        Naranjo argues the trial court erred in striking Juror 36 for cause, violating Naranjo's constitutional rights to due process and a fair trial.  Trial judges are in the best position to "assess the demeanor of the venire, and of the individuals who compose it."  *Uttecht v. Brown*, 551 U.S. 1, 9, 20 (2007).  Accordingly, we review a trial court's decision to strike a potential juror for cause for abuse of discretion.  *State v. Jones*, 197 Ariz. 290, 302 ¶¶ 24, 26, 4 P.3d 345, 357 (2000).

4

¶13       Question thirty-five on the jury questionnaire asked: "Do you have any religious, moral, philosophical, or ethical issues that would prevent you from passing judgment on another human being if selected as a juror in this case?". Juror 36 marked "Yes" and explained: "I believe in God & he does not kill people for their mistakes." When asked in another question, "Is there anything about the alleged facts of this incident that would affect your ability to be a fair and impartial juror in this case?", Juror 36 responded: "See #35." In response to another question that asked, "Will you, for whatever reason, automatically vote **against** the death penalty without considering the evidence and the instructions of law that will be presented to you?," Juror 36 did not answer yes or no, but rather wrote in the margin: "[N]ot sure[;] need more info."

¶14       During small-group questioning of prospective jurors in court, the prosecutor directed Juror 36 to her response to question thirty-five, asking: "If the facts and the law says the death penalty is appropriate, can you do it even though you believe it violates the tenets of God?". Juror 36 responded: "Yes." When asked to elaborate on her answer to the question regarding whether she would automatically vote against the death penalty, Juror 36 stated: "I just don't know the whole case. I don't know the whole story."

¶15       The State also asked Juror 36 about her answer to a question on which she indicated she might have difficulty viewing photographs of a fetus because she had undergone an abortion that was "not [her] decision." The prosecutor asked Juror 36 "whether or not your prior experience and what's happened to you is so great that this just might not be the case for you," and Juror 36 responded: "I'm not sure." She later confirmed that the questions concerning the death penalty and the fetus were "emotional topics" for her, but affirmed she would "listen to both sides fairly and impartially."

¶16       After the prospective jurors were excused for the day, the State moved to strike Juror 36 and one other juror. The judge agreed to strike Juror 36, stating: "The Court's had an opportunity to view her demeanor during jury selection, listen to her answers. Her demeanor is her head was down, she's very, very emotional. The Court views her answers as confusing, at best, and it was hard for her to articulate."

¶17         A trial court may strike a prospective juror for cause only when the juror's views on capital punishment "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 433 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). Jurors who merely "voice[] general objections to the death penalty or express[] conscientious or religious scruples against its infliction" may not be struck for cause. *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968). The State, however, need not prove a juror's bias with "unmistakable clarity." *State v. Moody*, 208 Ariz. 424, 450 ¶ 88, 94 P.3d 1119, 1145 (2004). "[E]ven if a juror is sincere in his promises to uphold the law, a judge may still reasonably find a juror's equivocation 'about whether he would take his personal biases in the jury room' sufficient to substantially impair his duties as a juror, allowing a strike for cause." *State v. Ellison*, 213 Ariz. 116, 137 ¶ 89, 140 P.3d 899, 920 (2006) (quoting *State v. Glassel*, 211 Ariz. 33, 48 ¶¶ 49–50, 116 P.3d 1193, 1208 (2005)). In assessing whether to strike a juror, the judge must consider "the entirety of [the juror's] answers and demeanor." *State v. Lynch*, 225 Ariz. 27, 35 ¶ 28, 234 P.3d 595, 603 (2010).

¶18         Considering Juror 36's written and oral answers in isolation, it is unclear whether her views would have substantially impaired her ability to serve on the jury. Although Juror 36 initially expressed doubt about whether she could vote for the death penalty, citing her religious beliefs, on further questioning she stated twice that she could be fair and impartial.

¶19         A judge's credibility findings, however, "cannot be easily discerned from an appellate record." *Wainwright*, 469 U.S. at 429. Even when unfitness is not apparent from the record, "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Id.* at 425–26. For that reason, we defer "to the trial judge who sees and hears the juror." *Id.* at 426; *see also State v. Hausner*, 230 Ariz. 60, 70 ¶ 20, 280 P.3d 604, 614 (2012); *Moody*, 208 Ariz. at 450 ¶ 88, 94 P.3d at 1145.

¶20         The trial court believed that Juror 36's demeanor and emotions cast doubt on her ability to serve. She had difficulty articulating her answers, her head was down during questioning, and she was very emotional. Based on this record, we cannot say that the trial judge abused

his discretion by striking Juror 36 for cause. *See Lynch*, 225 Ariz. at 35 ¶ 28, 234 P.3d at 603.

## C. Juror Questionnaire

**¶21**　　　Naranjo and the State both submitted proposed juror questionnaires to the trial court. After reviewing them, the judge stated that he "chose the defense questionnaire" but edited it to remove questions that "were not appropriate." The defense objected to the court's deletion of certain questions from the written questionnaire sent to prospective jurors.

**¶22**　　　On appeal, Naranjo challenges the removal of the following six questions:

> 44. . . . a) Do you believe that a person can ever be unable to appreciate the wrongfulness of their criminal conduct at the time of its commission, due to a mental disease or defect?
>
> b) What are your thoughts/feelings, if any, regarding a defendant who raises an insanity defense?
>
> c) Do you have any thoughts/feelings on the insanity defense that have been formed or influenced by any recent articles or stories in print, television, radio or Internet media?
>
> . . . .
>
> 51. Do you feel that anyone who intentionally kills a pregnant woman must receive the death penalty?
>
> 52. Do you feel that anyone whose intentional killing of a pregnant woman results in the death of an unborn child must receive the death penalty?
>
> . . . .

7

54. Could you consider mental health-related issues of a defendant convicted of first degree murder as mitigation?[2]

**¶23** Although Arizona Rule of Criminal Procedure 18.5(d) permits the use of questionnaires, "there is no right to use jury questionnaires in Arizona." *Moody*, 208 Ariz. at 451 ¶ 93, 94 P.3d at 1146. Rule 18.5(d) requires only that the court "conduct a thorough oral examination of prospective jurors." "The court may impose reasonable limitations with respect to questions allowed during a party's examination of the prospective jurors." Ariz. R. Crim. P. 18.5(d).

**¶24** Naranjo argues that, by precluding the listed questions, the judge "refused to allow defense counsel to *voir dire* jurors on their attitudes about the insanity defense, the killing of pregnant women, and mental illness." To prevail on his claim that the court failed to adequately question the jury panel, Naranjo "must demonstrate not only that the voir dire examination was inadequate, but also that, as a result of the inadequate questioning, the jury selected was not fair, unbiased, and impartial." *Moody*, 208 Ariz. at 451 ¶ 95, 94 P.3d at 1146. We review a trial court's decisions regarding the use and content of jury questionnaires for abuse of discretion. *Id.* at 451 ¶ 93, 94 P.3d at 1146.

**¶25** First, contrary to Naranjo's claims, the trial court did not prevent him from conducting voir dire of potential jurors. Although the judge struck certain questions from the defense questionnaire, he left open the possibility of further, in-court questioning during the small group voir dire proceedings.

**¶26** Later, when defense counsel was explaining the need to ask question 54, the judge said "[t]his is a premature discussion . . . . Let's get to the small groups and see what the small groups have to say one way or the other." By inviting counsel to ask questions during oral voir dire, the trial judge "mitigate[d] any deficiency" in the questionnaire. *Moody*, 208 Ariz. at 452 ¶ 98, 94 P.3d at 1147. And, as the State correctly notes,

---

[2] As the trial court observed, questions such as number 54 are inappropriate, whether asked in a questionnaire or in oral voir dire. *See Glassel*, 211 Ariz. at 47 ¶ 44, 116 P.3d at 1207 (parties may not "ask potential jurors what types of evidence they will consider to be mitigating").

"Naranjo does not identify any questions he was prevented from asking jurors during oral *voir dire*."

**¶27**     This case is not like *State v. Anderson* (*Anderson I*), 197 Ariz. 314, 4 P.3d 369 (2000).  In *Anderson I*, the judge removed three jurors for cause based on their answers to questions on the written questionnaire. *Id.* at 318 ¶ 5, 4 P.3d at 373.  The judge denied defense counsel's request to rehabilitate the jurors through oral voir dire. *Id.*  We held that denying the defense any opportunity to rehabilitate jurors constituted structural error. *Id.* at 324 ¶ 23, 327 ¶ 36, 4 P.3d at 379, 382.  Here, by contrast, the judge did not deny Naranjo an opportunity to question the jurors orally.

**¶28**     Second, Naranjo has not shown that the jury selected was unfair, biased, or partial.  Naranjo argues that three jurors' responses raised concerns about bias:  Juror 62 (seated as Juror 5), Juror 204 (seated as Juror 14), and Juror 240 (seated as Juror 15).  Naranjo asserts that "[a]ll three of these seated jurors had direct personal experience with mental illnesses."  But Naranjo did not take the opportunity to raise these concerns during voir dire, and all three potential jurors stated that they could fairly listen to the testimony and review the evidence presented in the case.  Nor did he attempt to strike these jurors or object to them on grounds of bias.  The trial court did not abuse its discretion in screening and limiting questions used in the jury questionnaire.

## D.     Preclusion of Defense Expert Witnesses

**¶29**     Naranjo argues that the trial court abused its discretion in precluding or limiting the testimony of three of his witnesses.  In reviewing a trial court's choice and imposition of sanctions under Arizona Rule of Criminal Procedure 15.7, we will find an abuse of discretion only when "no reasonable judge would have reached the same result under the circumstances." *State v. Armstrong*, 208 Ariz. 345, 354 ¶ 40, 93 P.3d 1061, 1070 (2004).

**¶30**     Rule 15.7 authorizes the trial court to sanction a party for discovery violations, including failure to timely disclose evidence. *State v. Payne*, 233 Ariz. 484, 518 ¶ 155, 314 P.3d 1239, 1273 (2013).  Any sanction, however, "must be proportional to the violation and must have a 'minimal effect on the evidence and merits.'" *Id.* (quoting *State v. Towery*, 186 Ariz. 168, 186, 920 P.2d 290, 308 (1996)).  "[P]reclusion is rarely an

appropriate sanction for a discovery violation," *State v. Delgado*, 174 Ariz. 252, 257, 848 P.2d 337, 342 (1993), and should be invoked only when less stringent sanctions would not achieve the ends of justice. *State v. Smith*, 140 Ariz. 355, 359, 681 P.2d 1374, 1378 (1984). Before precluding a witness under Rule 15.7, the trial court must examine the surrounding circumstances, specifically considering the following factors: (1) how vital the precluded witness is to the proponent's case; (2) whether the witness's testimony will surprise or prejudice the opposing party; (3) whether bad faith or willfulness motivated the discovery violation; and (4) any other relevant circumstances. *Id.*

### 1. Preclusion of Steve Brown

**¶31** On the day of the murders and Naranjo's arrest in March 2007, Steve Brown—then a contracted mental health evaluator for Correctional Health Services (CHS) in Phoenix—observed Naranjo "cowering" in his jail cell and holding his hand over his head. Brown later reported that during his assessment, Naranjo looked up to the ceiling and said, "see all the dead people up there." Brown concluded that Naranjo was actively hallucinating and that his psychosis was not drug-induced. Naranjo first became aware of Brown's assessment in 2008.

**¶32** In March 2009, Naranjo tried to locate Brown through CHS, but learned that he no longer worked there. Naranjo took no further steps to find Brown for nearly a year. In March 2010, Naranjo unsuccessfully attempted to contact Brown at his new place of employment, Compass Mental Health. Naranjo again waited almost a year before resuming efforts to find Brown, ultimately reaching him at Compass Mental Health in late March 2011.

**¶33** Nine days after his trial began, Naranjo disclosed for the first time his intention to call Brown as a witness during the guilt phase. The following week, Naranjo asked to call Brown, despite the untimely disclosure, attaching affidavits describing his efforts to locate Brown. The trial court denied the request, finding that Naranjo had not exercised diligence in searching for Brown and, as a result, the State had no opportunity to locate a witness to counter Brown's testimony. During the guilt phase, Naranjo's mental health expert, Dr. Thompson, read into the record the notes from Brown's assessment of Naranjo. Naranjo argues that this did not adequately present such crucial evidence to the jury, and

that the trial court abused its discretion in precluding Brown's testimony about his firsthand observations of Naranjo on the day of the murders.

¶34    Preclusion may be an appropriate sanction when a party engages in "willful misconduct, such as an unexplained failure to do what the rules require." *State v. Killean*, 185 Ariz. 270, 271, 915 P.2d 1225, 1226 (1996). In *Killean*, the trial court precluded admission of "corroborative documentary evidence as a sanction for the defendant's . . . fail[ure] to reveal the existence of the evidence until trial." *Id.* at 270, 915 P.2d at 1225. We held that, although the trial court found that the defense had not acted in bad faith, preclusion of the evidence was not an abuse of discretion because the defense "knowingly failed to perform a known legal obligation." *Id.* at 271, 915 P.2d at 1226.

¶35    Here, Naranjo's failure to locate Brown before trial did not stem from investigative difficulties or a last-minute oversight, but rather from a pervasive lack of diligence stretching over a four-year period. Similar to the situation in *Killean*, Naranjo knew of a favorable witness's identity and location well before trial, yet did not disclose him as a potential witness, as required by Rule 15.2(b), until after trial had started. Because Naranjo's failure to exercise due diligence could reasonably be construed as "willful misconduct," the trial court did not err in precluding Brown's testimony on that basis.

¶36    The court considered the importance of the witness, the surprise to the State, and the State's inability to find a rebuttal witness on short notice. *See Smith*, 140 Ariz. at 359, 681 P.2d at 1378. It also considered but rejected the argument that a short continuance was sufficient to cure the prejudice to the State resulting from the late disclosure. Finally, the court considered as an "other circumstance" under *Smith* that the jury had heard Brown's assessment of Naranjo's condition through the testimony of Dr. Thompson.

¶37    Although Dr. Thompson read Brown's notes into the record, Naranjo asserts that "cannot replace the testimony of a living witness, describing what he saw and heard." But these assertions do not excuse Naranjo's failure to diligently pursue and locate Brown, nor do they diminish the prejudice to the State resulting from the late disclosure.

**¶38** Whenever possible, trial courts should try to handle disclosure violations in some way other than precluding a witness, particularly in a capital case such as this in which the witness's proffered testimony relates to mental health issues that are central to the defense. But, considering all the circumstances here, including admission through Dr. Thompson of the substance of Brown's notes, we cannot say the trial court abused its discretion in precluding Brown's testimony under Rule 15.7.

### 2. Partial Preclusion of Dr. Switzky

**¶39** During the penalty phase in April 2011, Naranjo called Dr. Harvey Switzky to provide expert testimony regarding Naranjo's mental state. Dr. Switzky had previously disclosed a report in which he determined that Naranjo was intellectually disabled,[3] an opinion he also expressed at trial. The first section of that February 2009 report set forth the various matters Dr. Switzky considered in forming his opinion. In addition to interviews and other records, Dr. Switzky relied on the evaluations and data of Dr. Thompson, who testified in the guilt phase.

**¶40** On cross-examination, the State questioned Dr. Switzky about several errors in Dr. Thompson's raw data. Naranjo was aware of these potential errors before trial, but did not disclose them to Dr. Switzky. Dr. Thompson's errors gave Dr. Switzky "pause," but before the State could fully explore the issue, the court adjourned for the day.

**¶41** Dr. Switzky did not retake the witness stand for eleven days. The State agreed to interrupt its cross-examination of Dr. Switzky to allow an evidentiary hearing regarding Dr. Thompson's faulty data. According to the trial judge, defense counsel then "unilaterally changed the schedule again," further delaying Dr. Switzky's resumed cross-examination.

**¶42** During the break in his testimony, Dr. Switzky drafted a revised "IQ assessment," which Naranjo disclosed two days before Dr.

---

[3] When the legislature last amended A.R.S. § 13-753 in 2011, it replaced the term "mental retardation" with "intellectual disability." Although the parties and the trial court generally used the former term, this Court adopts the latter, in keeping with current Arizona law and contemporary medical and ethical standards.

Switzky retook the stand. The new assessment rejected Dr. Thompson's findings, instead relying on the findings of Dr. Joanne Babich, a court-appointed expert who concluded that Naranjo was not intellectually disabled based on an IQ score of 76. Dr. Switzky adjusted Dr. Babich's raw IQ score according to the "Flynn Correction," which shifts a person's IQ score downward to reflect that today's population is smarter than the population used to standardize the IQ test. Accounting for the Flynn Correction, Dr. Switzky concluded that Naranjo's IQ was 72, within the range of intellectual disability. *See* A.R.S. § 13-753(K)(3), (5).

**¶43** Dr. Switzky was aware of the Flynn Correction before disclosing his February 2009 report, but chose to not discuss it in that report. The defense also had access to Dr. Babich's raw data before trial, but Dr. Switzky did not use or rely on that information until he prepared his new assessment during the penalty phase.

**¶44** Finding that Dr. Switzky's new assessment was untimely disclosed, the trial court presented Naranjo with a choice of sanctions: either the court would preclude Dr. Switzky's testimony entirely or limit it to what was contained in his February 2009 report. Naranjo chose the second option and now challenges the trial court's ruling.

**¶45** In partially precluding Dr. Switzky's testimony, the trial court found that defense counsel "intentionally and purposefully" changed the witness schedule to give Dr. Switzky "time to go back and revise his opinions" after a damaging cross-examination. The court also found that Naranjo "violated the Rules of Criminal Procedure" by not seeking leave to allow Dr. Switzky to reformulate his opinions after cross-examination had already begun.

**¶46** Even if defense counsel's action regarding Dr. Switzky was not motivated by bad faith, the trial court could have found it amounted to "willful misconduct, such as an unexplained failure to do what the rules require." *Killean*, 185 Ariz. at 271, 915 P.2d at 1226. Like the defendant in *Killean*, Naranjo has not explained his failures to abide by the disclosure rules or to seek leave to disclose Dr. Switzky's new assessment.

**¶47** Naranjo argues that a continuance would have been a more appropriate remedy. Although a trial court should consider lesser sanctions before precluding evidence, we will not disturb its decision as

13

long as the record demonstrates it *could have found* lesser sanctions insufficient. *See id.* (finding preclusion appropriate even when the court did not explicitly consider other sanctions, because "[o]ther remedies could legitimately be found inadequate"). Here, the trial court could have reasonably found that preclusion was essential to achieve the ends of justice because it was unclear whether a short continuance would suffice to allow the State to review and respond to Dr. Switzky's new assessment. *See id.* (noting that a continuance may be inappropriate if the court cannot determine "how long a continuance would be necessary" to allow the State to formulate responses to newly disclosed opinions).

¶48　　　We cannot say the court abused its discretion in precluding Dr. Switzky from testifying about his new, untimely disclosed assessment, based on different data, in the penalty phase. The trial court could have found willful misconduct and lesser or alternative sanctions insufficient. But we strongly encourage trial courts, whenever possible, to fully explore on the record other options, procedural safeguards, and alternative means of alleviating any prejudice before precluding witnesses as a sanction for disclosure violations, particularly in a capital case.

### 3. Preclusion of Dr. Wu

¶49　　　In June 2010, Naranjo underwent a Positron Emission Tomography ("PET") scan and disclosed Dr. Joseph Wu as an expert witness who would provide mitigation testimony regarding the scan results. In August, the trial court ordered the release of Naranjo's PET scan records, including "all images, notes, reports, and other raw data." Naranjo, in turn, produced a one-page document from Dr. Wu describing the scan and concluding that Naranjo's "pattern is compatible with brain injury or neuropsychiatric injury."

¶50　　　The State moved for production of Dr. Wu's underlying data, arguing that it could not obtain an expert to counter Dr. Wu or properly cross-examine him without additional information. In granting the motion in October, the trial court ordered Naranjo to provide the State with the "methodology Dr. Wu [used] during the administration of the PET scan," as well as copies of any articles referenced by Dr. Wu in forming his opinion. Despite the State's repeated requests, Naranjo made no effort to comply with the court's August and October 2010 orders for more than six months. Finally, shortly before the penalty phase in April

2011, Naranjo disclosed Dr. Wu's responses in the form of a one-page spreadsheet. As Naranjo acknowledges, the spreadsheet did not include the relevant raw data, nor did Dr. Wu provide copies of any articles that he relied on in reaching his conclusion.

¶51 The State moved to preclude Dr. Wu from testifying during the penalty phase, arguing that Naranjo's failure to disclose the requested information prevented it from adequately preparing for cross-examination. At an evidentiary hearing on the motion, Dr. Wu testified telephonically that he "did not keep the raw data" for any of the PET scans, including Naranjo's. Dr. Wu also acknowledged that he was not present during the PET scan and could not describe Naranjo's performance. The trial court granted the State's motion, precluding Dr. Wu from testifying because Naranjo did not comply with the August and October 2010 orders. In so ruling, the court emphasized that without the underlying data for Dr. Wu's conclusions, the State lacked any way "to effectively cross-examine [Wu]."

¶52 Naranjo argues that the trial court abused its discretion in precluding Dr. Wu because the State was not prejudiced as a result of the non-disclosure. He contends that a short continuance would have been a more appropriate sanction.

¶53 We find no abuse of discretion. By failing to preserve and disclose the raw data from Naranjo's PET scan, Dr. Wu effectively foreclosed any meaningful inquiry into the validity of the assessment. Unlike the defendant in *State v. Cota*, on which Naranjo relies, the State was left with no fair opportunity to refute Dr. Wu's conclusions. 229 Ariz. 136, 149 ¶ 60, 272 P.3d 1027, 1040 (2012) (holding that the trial court properly denied Cota's motion to preclude because "he had access to all relevant information" before cross-examining the witness). A short continuance would not have changed the fact that the State had no raw data with which to obtain its own expert opinion. And, although Dr. Wu eventually acknowledged that he did not retain the raw data for Naranjo's visual vigilance task test, he could have and should have disclosed that fact months before the penalty phase.

¶54 Naranjo further argues that precluding Dr. Wu from testifying "kept the jury from hearing relevant mitigation evidence," violating the prohibition against cruel and unusual punishment. Naranjo

suggests that the jury "must not be precluded from considering . . . any aspect of the defendant's character or record" when offered for purposes of mitigation in a capital case. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *State v. Hoskins*, 199 Ariz. 127, 147 ¶ 86, 14 P.3d 997, 1017 (2000).

¶55        Although that general proposition is correct, in exercising the right to present witnesses, a defendant must "'comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'" *Taylor v. Illinois*, 484 U.S. 400, 411 n.15 (1988) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)).

¶56        In the same vein, this Court has held that a trial judge may preclude capital defendants from presenting mitigation evidence, in whole or in part, as a sanction for a discovery violation. *State v. Hampton*, 213 Ariz. 167, 177–78 ¶¶ 43–44, 140 P.3d 950, 960–61 (2006) (upholding the preclusion of mitigation testimony when defendant refused to submit to State's mental health evaluation); *accord People v. Hayes*, 364 N.W.2d 635, 639–41 (Mich. 1984). Here, as in *Hampton*, Naranjo's failure to comply with the court's disclosure orders denied the State a fair opportunity to test and rebut Dr. Wu's intended testimony.

¶57        The trial court did not violate Naranjo's constitutional rights or otherwise abuse its discretion in precluding him from calling Dr. Wu as a sanction for his failure to comply with prior court orders.

**E. Other Act Evidence**

¶58        Naranjo argues that the trial court committed fundamental error by allowing evidence of statements Naranjo made four years before the murders. To establish fundamental error, a defendant must show that (1) an error occurred; (2) the error goes "to the foundation of the case, . . . takes from the defendant a right essential to his defense, [or is] of such magnitude that the defendant could not possibly have received a fair trial"; and (3) the error prejudiced the defendant. *State v. Henderson*, 210 Ariz. 561, 567 ¶¶ 19–20, 115 P.3d 601, 607.

¶59        While cross-examining Dr. Thompson in the guilt phase the prosecutor read, without objection, from a police report describing statements Naranjo made to a female police officer during his arrest for

domestic violence in 2003. The pertinent exchange between the prosecutor and Dr. Thompson is as follows:

> Q. Now, I'm going to hand you what's been marked as Exhibit Number 2. . . . .
>
> . . .
>
> Q. Let me read it. I don't want to embarrass you. I apologize for the language. These are quotes out of the police report. And this is according to the police report, this is a summary of what the audio-taped recording was; is that correct?
>
> A. That's correct.
>
> Q. [Naranjo] was aggressive and began slamming his head in the patrol car shield. [Naranjo] also kicked the shield and doors. [Naranjo] swore in a profane manner. [He] told me several times he hit Christine in the face because . . . , "What would you do if your daughter was being finger-fucked?" [Naranjo] told me, "You watch, in a couple of months I'll be out, and I'll fucking kill all those bitches." [He] told me several times, "A couple of months in the mental hospital, you'll see. I'll be right back out again. And you just watch, I'll fuck my daughter up real good. She won't be able to say shit again." [Naranjo] told me, "And you little ho cop. I'll fuck you up in the ass, and you'll say more, more, more and more." [Naranjo] told me he would fake a mental illness and get out. "It's happened before. You'll see. And you're at the top of my list, you bitch."
>
> A. Correct.

¶60 In closing argument, the prosecutor referenced that police report, stating:

> Well, you've got a guy who's got a history of faking mental illness, and we've seen that from his 2003 police report from the child abuse where he tells the officer, that's okay, I'm going to fake a mental illness and I'll be out in a couple of

17

months, and then he goes into detail about what he's going
to do to his daughter and to the police officer when he gets
out.

¶61      Generally, the state may not use evidence of other acts "to
show that a defendant is a bad person or has a propensity for committing
crimes." *State v. Roque*, 213 Ariz. 193, 211 ¶ 54, 141 P.3d 368, 386 (2006)
(internal quotation marks omitted) (citing Ariz. R. Evid. 404(b)).  But,
"[w]hen insanity is at issue, evidence of prior bad acts is admissible if
relevant . . . and if the probative value of the evidence is not substantially
outweighed by unfair prejudice." *State v. Vickers*, 159 Ariz. 532, 540, 768
P.2d 1177, 1185 (1989) (citing Ariz. R. Evid. 402, 403).

¶62      As Naranjo acknowledges, some of the prior statements are
relevant because they tend to make the existence of a relevant fact—
Naranjo's alleged insanity—more or less probable.  *See* Ariz. R. Evid. 401.
Specifically, Naranjo's remarks that "he would fake a mental illness and
get out" because "[i]t's happened before" are directly relevant to his
insanity defense.  The trial court could reasonably conclude that any
potential unfair prejudice to Naranjo resulting from admission of those
statements would not substantially outweigh their probative value.
Because those statements would have been admissible even had Naranjo
objected below, no error resulted from their use.

¶63      But we are not persuaded that evidence about all of
Naranjo's prior statements and conduct was admissible.  The 2003 police
report's reference to Naranjo's actions in the back of the patrol car,
including his kicking the patrol car doors, had no relevance to any issue in
this case.  More troubling still is the State's use of the threatening, profane
remarks Naranjo made about the female police officer and his daughter.
That evidence merely depicts Naranjo as a bad person, an improper use of
other act evidence, even when the defense is insanity.  *See Roque*, 213 Ariz.
at 211 ¶ 54, 141 P.3d at 386.  Any marginal relevance was clearly
outweighed by the risk of unfair prejudice.[4]

---

[4]      As we have stated, "prosecutors are not mere advocates, . . . but
should act as ministers of justice to ensure that defendants receive a fair
trial." *State v. Miller*, ___ Ariz. ___, ¶ 21 n.3, 316 P.3d 1219, 1227 n.3 (2013)
(citing *Roque*, 213 Ariz. at 228 ¶ 153, 141 P.3d at 403 (2006)).  The State

**¶64**      Although the State's use of those portions of the 2003 police report is disturbing, the trial court's failure to *sua sponte* exclude them does not rise to the level of fundamental error.  Admission of this evidence did not deprive Naranjo of a fair trial, the jury's verdicts were not based on improper factors, and Naranjo has not established prejudice.  The State produced substantial evidence of Naranjo's guilt, including his recorded confession to the crime, the testimony of an eyewitness (Rivera's eight-year-old daughter) who saw the stabbings, discovery of the murder weapon in Naranjo's vehicle, and the victim's blood appearing on the clothes Naranjo was wearing at the time of his arrest.  Given the nature and extent of the evidence against Naranjo, we find no fundamental error.  *See State v. Hargrave*, 225 Ariz. 1, 9 ¶ 19, 234 P.3d 569, 577 (2010) (finding no fundamental error in the use of potentially inadmissible statements when "[t]he State produced substantial evidence of [the defendant's] participation" in the crimes charged).

**F. Expert Qualification**

**¶65**      Naranjo argues that Dr. Michael Bayless, the State's mental health expert who testified in the guilt and penalty phases, was not a qualified expert under A.R.S. § 13-753(K)(2) and that, therefore, the trial court erred in allowing him to testify on the issue of Naranjo's intellectual ability.  A trial court has broad discretion in determining whether a witness is competent to testify as an expert. *Gemstar Ltd. v. Ernst & Young*, 185 Ariz. 493, 505, 917 P.2d 222, 234 (1996).  We will not overturn a ruling allowing expert testimony absent an abuse of discretion. *State v. Boyston*, 231 Ariz. 539, 544 ¶ 14, 298 P.3d 887, 892 (2013).

**¶66**      Dr. Bayless received his Ph.D. in counseling psychology from Arizona State University in 1977, and he has practiced in Arizona as a licensed clinical psychologist since then.  When he testified in this case, Dr. Bayless was the director of clinical services at Bayless Behavioral Health Solutions.

**¶67**      In October 2008, the State retained Dr. Bayless to conduct a psychological evaluation of Naranjo, which Dr. Bayless performed in

---

disregarded that responsibility by introducing inflammatory, irrelevant statements from an unredacted police report, even absent objection.

February 2009. After interviewing Dr. Bayless, Naranjo moved to preclude him from testifying, contending that he did not satisfy the requirements of § 13-753(K)(2). That section defines an expert in intellectual disabilities as "a psychologist or physician licensed pursuant to title 32, chapter 13, 17 or 19.1 with at least five years' experience in the testing or testing assessment, evaluation and diagnosis of intellectual abilities."

¶68 At an evidentiary hearing on that motion, Dr. Bayless testified that he had diagnosed and treated patients with intellectual disabilities, but he could not say how many. Dr. Bayless further testified that he had performed "hundreds" or "thousands" of adaptive functioning and IQ tests during his thirty-year career. The trial court denied the motion, finding that Dr. Bayless was well qualified. During the penalty phase, Dr. Bayless testified that Naranjo did not have intellectual disabilities.

¶69 As a preliminary matter, we reject the State's argument that § 13-753(K)(2)'s requirements apply only to experts selected by the trial court during the pretrial phase. The statute expressly provides that "this section applies to all capital sentencing proceedings," A.R.S. § 13-753(J), which includes the penalty phase.

¶70 Viewed in the light most favorable to upholding the trial court's ruling, the record supports the finding that Dr. Bayless had at least five years' experience testing for, evaluating, and diagnosing intellectual disabilities. Although Dr. Bayless testified he had performed many adaptive functioning and IQ tests over his career, Naranjo claims that Dr. Bayless was not qualified under § 13-753(K)(2) because he "did not appreciate the requirements" that Arizona law imposes on an expert in intellectual disability.

¶71 But, the statute merely requires that Dr. Bayless be a licensed psychologist with at least "five years' experience." A.R.S. § 13-753(K)(2). Beyond that, the extent of Dr. Bayless's qualifications went to the weight of his testimony, not its admissibility. *See Boyston*, 231 Ariz. at 544 ¶ 18, 298 P.3d at 892 (citing *State v. Davolt*, 207 Ariz. 191, 210 ¶ 70, 84 P.3d 456, 475 (2004)).

¶72            The trial court did not abuse its discretion in finding that Dr. Bayless was qualified as an expert in intellectual disability under § 13-753(K)(2).

**G. Management of Maricopa County's Contract Attorneys**

¶73            Naranjo argues that "systemic problems" in how Maricopa County managed and monitored capital-case contract attorneys led to a violation of his right to counsel under the United States and Arizona Constitutions. He contends that the trial court should have declared a mistrial in the penalty phase to protect his constitutional rights. We review constitutional claims de novo, *State v. Harrod*, 218 Ariz. 268, 279 ¶ 38, 183 P.3d 519, 530 (2008), and a trial court's denial of a motion for mistrial for abuse of discretion, *State v. Dann* (*Dann I*), 205 Ariz. 557, 570 ¶ 43, 74 P.3d 231, 244 (2003).

¶74            Private attorneys contracting with the Office of Public Defense Services (OPDS) represented Naranjo in this case. During the penalty phase, one of Naranjo's experts, Dr. Switzky, testified that Naranjo had intellectual disabilities, basing his conclusion on family statements and two IQ tests. Dr. Thompson, who testified on Naranjo's behalf in the guilt phase, administered one of those tests, the Wechsler Adult Intelligence Scale III. As noted above, the State's cross-examination of Dr. Switzky revealed serious flaws in the methodology of Dr. Thompson's testing, as well as in the raw data obtained from it.

¶75            Naranjo moved for a mistrial, alleging that serious questions existed about Dr. Thompson's credibility and effectiveness because he had provided "inaccurate assertions" in his reports, which purportedly resulted from "mishandled files" and other "office procedure problems." In denying that motion, the trial court construed it as a claim of ineffective assistance of counsel that could be brought only after trial in post-conviction relief proceedings. *See State v. Spreitz*, 202 Ariz. 1, 3 ¶ 9, 39 P.3d 525, 527 (2002).

¶76            The right to counsel "extends to 'all critical stages of the criminal process,'" Moody, 208 Ariz. at 445 ¶ 65, 94 P.3d at 1140 (quoting *Iowa v. Tovar*, 541 U.S. 77, 80–81 (2004)), and is violated when a defendant is "denied counsel . . . [or] if counsel entirely fails to subject the

prosecution's case to meaningful adversarial testing," *United States v. Cronic*, 466 U.S. 648, 659 (1984).

¶77　　　Naranjo concedes that any alleged error below did not amount to the complete denial of counsel held to be structural error in *Gideon v. Wainwright*, 372 U.S. 335, 344–45 (1963), but nonetheless contends that his attorneys' conduct at trial violated his right to counsel at a critical stage of the capital proceedings. Specifically, Naranjo asserts that the high volume of capital cases in OPDS created "systemic problems" during the years in question that prevented his counsel from properly preparing his case.

¶78　　　Naranjo has not argued that "he was effectively deprived of counsel" at a critical stage of the proceedings, *State v. Kiles*, 222 Ariz. 25, 34 ¶ 42, 213 P.3d 174, 183 (2009), and the record does not establish that his trial counsel "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing," *Cronic*, 466 U.S. at 659. He was represented by counsel throughout the proceedings below. In each phase of the trial, counsel called and cross-examined witnesses and presented evidence and arguments on Naranjo's behalf. *Cf. Glassel*, 211 Ariz. at 51 ¶¶ 62–64, 116 P.3d at 1211 (finding no right-to-counsel violation when defense counsel did not call witnesses in the penalty phase and instead relied on evidence already developed during the guilt phase).

¶79　　　Still, Naranjo argues that the trial court should have declared a mistrial to "protect [his] right to counsel and a fair trial." But there is no basis in the record to conclude that the court abused its discretion in denying his motion for mistrial. Beyond his unpersuasive argument that his right to counsel was violated, Naranjo does not identify any trial error that would have required a mistrial. *See State v. Adamson*, 136 Ariz. 250, 262, 665 P.2d 972, 984 (1983) ("[A] mistrial is the most dramatic remedy for trial error and should be granted only when it appears that justice will be thwarted unless the jury is discharged and a new trial granted."). Although Dr. Switzky's reliance on "inaccurate assertions" from Dr. Thompson's reports might well have undermined his testimony, that revelation resulted from proper cross-examination. Naranjo cites no authority to suggest that a mistrial is the appropriate remedy when a defendant detrimentally relies on his own witness's expertise and testimony.

**¶80**        Instead, consistent with the trial court's analysis, many facts that Naranjo offers to show trial error are better viewed as "cumulative evidence of alleged ineffectiveness." *Kiles*, 222 Ariz. at 34 ¶ 39, 213 P.3d at 183.  Naranjo's assertions are properly characterized as claims of ineffective assistance of counsel that are not cognizable on direct appeal. That the trial judge "admonished counsel" during the proceedings or "blamed counsel for [their] failure to prepare . . . key witnesses" does not show a violation of Naranjo's right to counsel that required the "dramatic remedy" of a mistrial, even if we accept all of his allegations as true.

## III. ABUSE OF DISCRETION REVIEW

**¶81**        We review the jury's finding of aggravating circumstances and the imposition of the death sentences for abuse of discretion.  A.R.S. § 13-756(A).  A finding of aggravating circumstances is not an abuse of discretion if "'there is any reasonable evidence in the record to sustain it.'" *State v. Delahanty*, 226 Ariz. 502, 508 ¶ 36, 250 P.3d 1131, 1137 (2011) (quoting *State v. Morris*, 215 Ariz. 324, 341 ¶ 77, 160 P.3d 203, 220 (2007)). We view the facts in the light most favorable to sustaining the jury's verdict.  *State v. Gunches*, 225 Ariz. 22, 25 ¶ 14, 234 P.3d 590, 593 (2010).

### A. Aggravating Circumstances

**¶82**        Naranjo contends that the State presented insufficient evidence to support the jury's finding that he murdered Rivera in an especially cruel manner.  A.R.S. § 13-751(F)(6).  He does not challenge the jury's findings on the other aggravating circumstances—prior serious offense, A.R.S. § 13-751(F)(2), and unborn child victim, § 13-751(F)(9).

**¶83**        A murder is especially cruel if the evidence establishes beyond a reasonable doubt that "'the victim consciously experienced physical or mental pain prior to death, and the defendant knew or should have known that suffering would occur.'" *State v. Snelling*, 225 Ariz. 182, 188 ¶ 25, 236 P.3d 409, 415 (2010) (quoting *State v. Trostle*, 191 Ariz. 4, 18, 951 P.2d 869, 883 (1997)).  "Evidence of a victim's pleas or defensive injuries" may be sufficient to show that she suffered mental pain. *Id.* ¶ 27. The victim need not have been conscious for every wound inflicted, *State v. Sansing* (*Sansing II*), 206 Ariz. 232, 235 ¶ 7, 77 P.3d 30, 33 (2003), nor must her suffering last for any specific period of time, *State v. Cropper*, 223 Ariz. 522, 526 ¶ 13, 225 P.3d 579, 583 (2010).

¶84        The record here supports the jury's finding that Rivera experienced mental anguish and physical pain during the murder.  As the State notes, Rivera suffered injuries consistent with defensive wounds, including a broken nail and several wounds on her arms.  Furthermore, Rivera's daughter testified that her mother screamed during the attack and attempted "to push [Naranjo] off."  The daughter also testified that Rivera spoke to her after Naranjo left the apartment.  Viewing the evidence in the light most favorable to sustaining the verdict, we conclude that a jury could reasonably find that Rivera was conscious during the attack and suffered mental and physical pain.  *See Morris*, 215 Ariz. at 341 ¶ 79, 160 P.3d at 220 (upholding finding of especial cruelty when evidence showed that the victims suffered and struggled during the murders); *Sansing II*, 206 Ariz. at 236 ¶ 10, 77 P.3d at 34 (noting that "defensive wounds, . . . pleas for help, and [the victim's] attempts to resist" establish mental anguish).

¶85        Naranjo also contends that the State did not adequately demonstrate that he knew or should have known that Rivera would suffer.  He suggests that because the prosecutor argued during the guilt phase that Naranjo's acts "were a result of lifetime drug abuse," the State could not plausibly maintain in the aggravation phase that "he was fully aware that his actions caused [Rivera] to suffer."

¶86        That Naranjo might have been under the influence of drugs at the time of the murder does not preclude a finding that Naranjo knew or should have known that Rivera suffered.  By rejecting Naranjo's insanity defense in the guilt phase, the jury implicitly found that Naranjo was capable of understanding the nature of his actions.  The record supports such a finding.  Naranjo stabbed Rivera twelve times, which itself suggests that he should have known that she suffered.  Moreover, during his interview he acknowledged that she screamed during the attack.

¶87        Because reasonable evidence supports a finding that Rivera's murder was especially cruel, the jurors did not abuse their discretion in so finding.  *Delahanty*, 226 Ariz. at 508 ¶ 36, 250 P.3d at 1137.

**B. Death Sentence**

¶88          During trial, Naranjo offered mitigation evidence relating to his alleged intellectual disability, mental illness, and difficult upbringing, and argued that a life sentence was sufficient to protect the public. The State cross-examined each witness and rebutted each mitigating factor. The jury did not find the proffered mitigation sufficiently substantial to call for leniency. *See* A.R.S. § 13-751(C), (E); § 13-752(G).

¶89          We must uphold a jury's determination that death is the appropriate sentence if any "reasonable juror could conclude that the mitigation presented was not sufficiently substantial to call for leniency." *State v. Gallardo*, 225 Ariz. 560, 570 ¶ 52, 242 P.3d 159, 169 (2010). Even if we assume Naranjo proved each of his alleged mitigating factors, the jury did not abuse its discretion in finding the mitigation insufficient to warrant leniency.

## IV. CONCLUSION

¶90          We affirm Naranjo's convictions and death sentences.[5]

---

[5]          Naranjo raises eighteen arguments against the constitutionality of Arizona's death penalty, all of which, as he acknowledges, this Court has previously rejected. We decline to revisit them here.